Justine S. Tannenbaum, Respondent, v Provident Mutual Life Insurance Company of Philadelphia et al., Appellants.

First Department, June 29, 1976

*Saul Goldstein* of counsel *(Patrick A. Lyons* with him on the brief; *Lester Schwab Katz & Dwyer,* of counsel to *Emile Z. Berman* and *A. Harold Frost,* attorneys), for Marvin S. Sterling, appellant.

*David R. Crow* of counsel *(Friend, Post & Hopkins,* attorneys), for Provident Mutual Life Insurance Company of Philadelphia, appellant.

*Bernard R. Selkowe* for respondent.

LUPIANO, J. The amended complaint of Justine Schaefer Tannenbaum, the widow of Dr. Louis E. Schaefer, alleges three causes of action. The first cause of action is against defendant Provident Mutual Life Insurance Company of Philadelphia (hereinafter "Provident") and is brought by plaintiff as beneficiary of an insurance policy on the life of Dr. Schaefer issued by Provident in the amount of $200,000 because of Provident's refusal to pay, on the death of Dr. Schaefer. The second cause of action against Provident and defendant Marvin S. Sterling (hereinafter "Sterling"), in essence pleads estoppel against defendants based on acts characterized in the pleading as sounding in fraud, but which upon close scrutiny reveal themselves in certain instances as sounding in negligence, that is, a failure to act with care in respect of a duty owing to the decedent, Dr. Schaefer. Although alleged against both defendants, this second cause has as its ultimate goal the

estopping of defendant Provident from disclaiming liability under the policy because of Dr. Schaefer's alleged material misrepresentations of his prior medical condition. The third cause of action against both Provident and Sterling for damages equal to the amount of the policy pleads, *inter alia,* that Dr. Schaefer was furnished with misleading and incomplete comparisons between the insurance policies already in existence on his life as issued by other companies and the proposed policy to be issued by Provident, that information was withheld by defendants which was necessary to a proper evaluation and determination by Dr. Schaefer and that defendants made no investigation as to the financial situation of Dr. Schaefer. It is further alleged taht the actions or inactions of defendants caused Dr. Schaefer to drop $200,000 of life insurance of the Guardian Insurance Company and to take the Provident policy of $200,000 as a replacement. Broadly viewed, this cause of action similarly sounds in fraud and negligence, although it emphasizes the fraudulent aspect.

Study of the record discloses the following pertinent facts:

In 1967, Dr. Schaefer, then 46 years of age, the husband of plaintiff and father of their two children, owned four policies issued by the Guardian Life Insurance Company (hereinafter "Guardian"), insuring his life, in the total face amount of $200,000 and naming the plaintiff as beneficiary. These policies had been obtained for Dr. Schaefer by defendant Sterling, then an agent in the employ of Guardian, between 1960 and 1964. In 1967, these policies were *incontestable.* In addition to the Guardian policies, Dr. Schaefer listed as extant life insurance policies on his life on his application for insurance in Provident dated July 24, 1967, the following: New York Life Insurance Company—$55,000, Bankers Life Insurance Company—$10,000, and a G.I. policy—$10,000. Thus, the total insurance in effect as of the date of his application to Provident was $275,000. The insurance thus maintained by Dr. Schaefer appears to have been in furtherance of his intent and plan to provide plaintiff in the event of his death with an annual income of $14,000 to enable her to maintain the two children and herself. In his letter to Dr. Schaefer, dated March 11, 1963, Sterling acknowledged this plan, observing: "I have run computations on providing income of $14,000 a year for Justine which works out as follows: 1. Utilizing only insurance a total face amount of $307,000 is required or 2. If we assume a 5% return on invested funds—there must be a

fund of $280,000 available, the difference in amounts being due to the guaranteed nature of the insurance income. In either event you are a little short of the goal." There is no evidence of any change at any time thereafter on Dr. Schaefer's part with respect to this plan or intent.[1]

Of interest is the fact that Sterling, who was the insurance agent involved in the vast majority of the relevant transactions whereby Dr. Schaefer obtained or attempted to obtain insurance, characterized himself as a mere "order taker" at trial, disclaiming in one fashion or another the traditional role of insurance salesman with its aspects of counsel, advice and guidance. Indeed, Sterling attempted at trial to portray the deceased Dr. Schaefer as an insurance expert. Sterling admitted that he possessed B.A. and M.B.A. degrees, that he taught life insurance agents for Guardian during his employment by said company, and for Provident thereafter. Of even stronger import is the fact that Sterling was a Chartered Life Underwriter (hereinafter "CLU") and a registered New York Insurance Consultant.

In 1966, Sterling left Guardian's employ for that of Berkshire Life Insurance Company. Coincidentally, Dr. Schaefer apparently expressed an interest in obtaining a $200,000 policy from this company (Sterling again disclaiming that he solicited this interest). However, before any action was taken to effectuate the issuance of such policy, Sterling's employment ended. In 1967, Sterling was employed full time by Provident. Coincidentally, Dr. Schaefer applied to Provident for a policy of insurance on his life in the face amount of $260,000. He executed an application for such insurance on July 24, 1967. The application consisted of Parts I and II as supplemented by a statement on back of a portion of the application. This statement, entitled "Supplementary Statement By Proposed Insured Or Applicant", contained two questions followed by boxes indicating a "Yes" or "No" answer. To the questions as to whether the insurance applied for was intended to replace insurance in Provident or to replace insurance in any other company, the "No" boxes were indi-

---

1. Subsequent to March 11, 1963 and prior to 1967, Dr. Schaefer realized his goal of $307,000 in the face amount of life insurance by the obtaining of additional Guardian policies in the amount of $50,000 and $100,000. However, the surrender of a New York Life Insurance policy and the lapse of the $100,000 Guardian policy, coupled with the loss of a group policy in 1965, resulted in the total face value of life insurance in 1967 of $275,000.

cated. There followed the signature of Dr. Schaefer. Immediately below on this supplemental form followed a series of questions to be completed and signed by the insurance agent relating to, *inter alia,* the agent's relationship with the proposed insured, the latter's estimated worth and annual income and the amount and mode of payment of the initial premium. Sterling set forth therein that he was personally acquainted with Dr. Schaefer for 13 years and estimated his worth at $350,000, with earned income of $60,000 and other income of $2,000. The information requested as to the initial premium set forth that it was yearly and in the amount of $7,338. On Part II of the application requesting, *inter alia,* pertinent medical history and details, Dr. Shaefer failed to note that on April 17, 1967, he was admitted to Lenox Hill Hospital. The admitting diagnosis was acute paranoid psychosis. Provident's Medical Guide indicates that where a "paranoid reaction" is suffered by an applicant within a two-year period, the application should be declined.

Assuming issuance by Provident of the policy originally applied for, Dr. Schaefer would then have insurance in the face amount of $525,000 (as contrasted with the amount of insurance Sterling advised in 1963 as necessary to fulfill the plan) upon which he would be paying in premiums and loan interest, approximately $14,500 annually. In accord with customary insurance practices, Provident requested a credit investigation report from Retail Credit Company. This independent investigative company forwarded to Provident a copy of a report from its files dated July 31, 1967 made for Continental Assurance with respect to Dr. Schaefer. The copy was received by Provident's underwriting department on August 28, 1967. Retail Credit Company advised Provident by a stamped notation affixed to the report that it was a copy as set forth above and that if further investigation was required at this time "please let us know." No request for further investigation was made by Provident. The Retail Credit Company's confidential "Special Life Report" set forth Dr. Schaefer's net worth at $150,000 with an annual salary or earned income of $50,000. A fairly detailed insurance history was also set forth. Further, the report indicated that Dr. Schaefer in response to questioning declared that his gross income of $50,000 a year resulted in net income in the $35,000 a year range and that the insurance he was applying for in the amount of $250,000 "is to replace already existing insurance

applications in order to obtain more desirable coverage and a lower premium rate." It was also noted that the doctor resides with his wife and two children, both of college age, in a home valued at some $60,000 of which he has $40,000 equity. A comparison of the information contained in the credit report with that delineated in the "Supplementary Statement" portion of the application discloses material inconsistencies which of necessity would require clarification and resolution by all reasonable means. Not only did Provident fail to request further investigation by the Retail Credit Company, it failed to contact its agent, Sterling, or to contact Guardian. By amendment to the application, the amount of insurance applied for was reduced to $200,000. Provident issued its policy of insurance No. 2111820 in the face amount of $200,000 dated September 15, 1967 to Dr. Schaefer, on his life. A few weeks later, Sterling, on behalf of Dr. Schaefer, surrendered the incontestable Guardian policies in the face amount of $200,-000. On March 9, 1968, Dr. Schaefer died under circumstances indicative of either suicide or accidental death. Plaintiff, as beneficiary under the Provident policy, made demand for payment upon Provident which was refused. Parenthetically it should be noted that plaintiff was also the beneficiary under the Guardian policies at the time of their surrender.

The answer of Provident sets forth an affirmative defense of rescission of the policy because of material misrepresentation contained in the application for insurance and a further defense that the policy is null and void because of the alleged suicide of Dr. Schaefer during the period of contestability. The policy provides in pertinent part that if the insured commits suicide within two years after the issue date, the amount payable is limited to premiums paid and that the policy will be incontestable after it has been in force during the insured's lifetime for two years after the issue date. At the close of trial, Provident withdrew the defense of suicide and this issue was not submitted to the jury. A jury verdict was rendered in favor of plaintiff against Provident on the first cause of action and on the third cause of action against both Provident and Sterling. On the second cause of action, the court granted judgment to the plaintiff against both defendants and dismissed defendants' motions to set aside the judgment and the verdict.

At trial, testimony in the form of excerpts from the examination before trial of Provident's medical director at the time

of Dr. Schaefer's application, Dr. Paul H. Langner, Jr., was read into the record to the effect that the company was obligated to investigate as to whether the denial of intent to replace existing policies as contained in the application was true, that it was the obligation of Mr. Hays of Provident's underwriting department to do this, that it was always done and that he assumed this would be done because it was standard procedure. Dr. Langner asserted that it was Provident's standard practice to always notify the other insurance company where replacement was involved so that such other company could defend itself against replacement. Charles H. Hays, an assistant underwriting officer for some 10 to 12 years with Provident (now retired) testified tht he marked Dr. Schaefer's application "Approved, 8/18 P.I." (that is, pending inspection by the Retail Credit Company). However, after receiving the Retail Credit Report, he admitted that he "didn't have the application in front of [him] when [he] had this inspection," that is, the inspection of the report. He denied that one of the purposes of the Retail Credit Report is to compare it with the statements on the application submitted by the agent despite the fact that the initial approval is one given *pending* such report. Remarkably, he declared in response to a question whether he ever went back to the application to ascertain whether the answers in the application were true upon examination of the report, that "(i)f there is any unfavorable information on the Retail Credit Company's inspection, then we get out the application." This method of proceeding is patently negligent in that whether information contained in the report *is* unfavorable may, in some instances, be determined *only* in comparison with the application. After all, the application was approved not absolutely, but pending receipt of the report. It is eminently reasonable to assume that the report will and should be used in conjunction with the application. Despite the fact that there was only a seven-day interval between the application and the credit report, Hays, surprisingly, declared that it would not have made any difference in his underwriting that the agent in the application reported net worth of $350,000, whereas the report set forth the applicant's statement as to net worth of $150,-000. Relying on the isolated factor of income (net $35,000) as critical, Hays admitted unconcern with the premium the applicant would be responsible for ($7,338 for Provident only).[2]

2. It appears that for the years 1960 through 1967, Dr. Schaeffer's annual net

This witness also admitted, after declaring that the problem of making the premium payments was that of Dr. Schaefer, that he did not know how the doctor could afford the policy. Nevertheless, insisting that despite the numerous apparent financial obligations incurred by the applicant as disclosed in the application and report, he would still approve the policy, Hays generalized that expenses of maintaining a home, providing for the children's education, paying taxes, etc. were "all built in", but could not specify how much was "built in" for each item. Of further note is Hays' admission that even if aware that the insurance applied for was to replace existing insurance, it was not a serious matter for investigation "because [the] replacement was something not in our company [Provident]." Sterling testified that the common practice in the insurance industry where there is a discrepancy between the application and the credit report is for the company with whom the application is filed to call the agent, who, in turn, contacts the applicant to resolve the discrepancy.

Robert P. Ryan, manager of the title and service department of Guardian testified in pertinent part as follows: a CLU is required to take many college courses in areas such as estate planning and finance and is regarded in the insurance field as a professional, an expert and a very knowledgeable individual. Provident never contacted Guardian to advise that the former was considering the issuance of insurance which would replace existing Guardian policies. In recognizing that incontestability is a factor which must be considered on the question of whether to replace insurance, he observed that it is the policy of Guardian where an applicant applies for a policy to replace one in another company, to notify the other company of such application. The purpose of notification between companies where replacement is involved is, according to this witness, to hold the business in the company where it originated, to give the agent an opportunity to conserve his own interest and to make certain that the policyholder has all of the facts before him before he makes a decision to surrender the policy he already has. He noted that the Retail Credit Company is an independent investigatory organization that simply gets a fee for services rendered, whether or not a policy is sold. Guardian's interest in retaining the business

income never exceeded $35,000 necessitating plaintiff's securing part-time employment commencing in 1964 to supplement the family income.

represented by the canceled policies was evidenced by its offer to reinstate same. Mr. Ryan stated that an insurance company is concerned that a policyholder is not being oversold, that is, overinsured. In response to the query—"Is it, then * * * that the insurance company holds the agent in such high regard, having theretofore screened him, that it now relies upon him to do a proper job in the representation of his client, the insured, and the company that he works for?" he replied: "That's correct." Relevant to the agent's self-interest, that is, securing further or greater commissions, Mr. Ryan defined the term "twisting" to mean "when a policyholder will have a policy in one company and the agent will, in turn, change or drop or reduce the current policies and place them with another company" with the consequent result that the policyholder is hurt.

Relevant to the comparisons between the Guardian policies and the proposed Provident policy prepared and furnished by Sterling for Dr. Schaefer's consideration, it is clear on this record that such analyses contained so much error that an inference of fraud or negligence was permissible. For example, the premiums due on the Guardian policies were overestimated, while the premium due on the Provident policy was underestimated; the cash value of the Guardian policies were underestimated and dividends were improperly estimated.[3] Further, the agent did not set forth with respect to Provident the fact that such policy would be contestable for two years in the event of material misrepresentation, although all four of the Guardian policies then owned by Dr. Schaefer were at that point incontestable. Thus, it could be reasonably concluded on the record that Sterling was motivated by a desire to cause the decedent to switch companies and that the misleading and often false comparison was an aid in fulfilling such goal.

Beyond cavil the life insurance business is highly competitive. A life insurance salesman, deriving his income from commissions earned on sales of life insurance, is motivated in this respect by self-interest. His purpose, thus viewed, is to *sell* life insurance. Both Robert P. Ryan, the manager of the title and service department of Guardian, and Bernard Eiber, an expert witness testifying for plaintiff, agreed that the first

---

3. Plaintiff's expert (Eiber) testified that in making a comparison it is improper to arbitrarily take one age of several policies, but that the policies should be compared on the age of the insured when issued.

duty of the CLU is to the applicant, the second is to the insurance company that employs him, and the third duty is to himself. Parenthetically, it is noted that plaintiff's expert, Mr. Eiber, was properly permitted to testify. The mere fact that Sterling had spoken to him in connection with the case is of no critical moment, because Eiber received no fee, rendered no opinion, and was not the recipient of confidential information (cf *Gallagher v Akoff Realty Corp.,* 197 Misc 460; *People ex rel Vogelstein v Warden,* 150 Misc 714, 717, affd 242 App Div 611). This witness described one of the basic concepts of the chartered life underwriter movement as that "of the underwriter being a professional, being one who would give consideration to all aspects of an applicant's physical and financial well-being, and that a chartered life underwriter should extend himself in every way to see to it that he recommends the best possible plan for the person with whom he is dealing." Mr. Eiber opined that the characterization of an agent holding a CLU designation as simply an "order taker for insurance" is totally inconsistent with the obligations and responsibilities of a CLU. Respecting the rendering of his professional advice, the CLU has a duty to ascertain in some detail the applicant's assets. Regarding the duties and responsibilities of the home office underwriter, Mr. Eiber stated that "the duty * * * is to examine the application, the agent's statements, the statements made by the applicant to the examining physician, to read the medical report of the examining physician, and to read the * * * credit report, which may have been made by somebody working for the company or by an independent credit agency, and *to consider all of those facts, together with the agent's recommendation"* (emphasis supplied). This expert unequivocally declared that the failure of the home office underwriter to compare the credit report with the application so as to be able to note discrepancies with the result that the evaluation is, in effect, made on the report alone, constituted *improper* underwriting.

Proper underwriting under the circumstances herein would have alerted Provident to the possibility that replacement insurance was involved. As aptly noted by plaintiff's expert: "Whenever an individual knows or has reason to believe that a policy being applied for in his company may replace existing insurance, he is required, and every insurance company in the State of New York, requires that the company which has received the application, must apprise the company whose

policy may be replaced, to give that company in which the insurance is presently in force, an opportunity to retain the business that it has on the books, and an opportunity to explain to the applicant that what he may be giving up may be inferior, may be different, beyond the point that he realizes, so that the applicant will have full information in order to make a determination as to whether or not it would be in his best interests, and in the best interest of his beneficiaries, to give up existing insurance and to replace it with other insurance."

Provident endeavors to find solace in the fact that the credit report it received was originally made for Continental Assurance Company. On this issue, Mr. Eiber stated: "It doesn't matter for which company an independent credit agency makes a report. The credit companies that are independent and are making reports for many insurance companies in the city, in the state, perhaps throughout the nation, make a report based on the information that they obtain, and they give this information to their subscribers. If an insurance company asks for a report on an individual and the credit company looks in their files and find that they have completed a report within a reasonable period of time, a week, a month, three months, they can send that report to the company requesting credit information, and say to the company, 'Look, we made this report a week, two, a month ago, and if you want any additional information, please let us know and we will be glad to give it to you.' But, the quality of the report is exactly the same." To reiterate, the application herein is dated July 24, 1967; on July 31, 1967, the applicant was interviewed by an investigator from the Retail Credit Company and is reported as saying that the insurance applied for (which is in the same face amount as originally requested in the Provident application) is intended to replace existing insurance and to obatin a lower premium cost; on August 28, 1967, Provident received that report pursuant to its request, which report indicated that the investigation was made for Continental Assurance Company and advises that a further inquiry will be made if Provident so desires. Under these circumstances, it is clear that the home office underwriter, upon proper observance of the duty owed to the applicant by a simple comparison of the application with the report, would have had reason not only to believe that there may be replacement insurance involved, which, in turn, would trigger a duty

to alert the company in which the existing insurance is in force, but would have been alerted to the possibility of overinsurance. In both cases, further inquiry and notification were indicated. The fact remains that Provident did have a Retail Credit report presented to it pursuant to its request which contained relevant and critical information, and this fact is not altered in significance because the report was originally ordered by another company. The cavalier handling of this matter by Provident demonstrates a dereliction of duty. Indeed, it appears that from inception, the application and consequent course of approval and issuance was treated with a studied indifference to the duties owed the doctor and, in turn, the plaintiff herein. Sterling, despite his plaint that he was a mere "order taker" and that it would have been presumptuous on his part to inquire of the doctor details as to his assets and financial circumstances, could well have advised his employer, Provident, that the information Sterling was required to supply Provident on the supplemental statement was not his estimate because the prospective insured was reluctant to give information. In this context, failure to observe the duties owed to the applicant and to fulfill the responsibilities inhering in a CLU by Sterling, may not shield Provident. Patently, the company itself is in the best position to protect a prospective insured by adequate screening and supervision of agents in its employ.

Provident seeks to escape liability on its policy because of a material misrepresentation made by the deceased in the application therefor, to wit, that the deceased failed to disclose any history of mental illness or his hospitalization on account thereof. With respect to the statement made by the deceased that insofar as he knew and believed, he was in good health, the actual falsity of such statement is without legal consequence if the statement is made in good faith. Provident asked for an opinion and, in the absence of bad faith, may not quarrel with the opinion given *(Sommer v Guardian Life Ins. Co.,* 281 NY 508). However, even an innocent misrepresentation as to specific diseases or ailments if material is sufficient to allow the insurer to avoid the contract of insurance or defeat recovery thereunder *(Eastern Dist. Piece Dye Works v Travelers Ins. Co.,* 234 NY 441, 449-450; 30 NY Jur, Insurance, §§ 947, 949). Subdivision 2 of section 149 of the Insurance Law provides that "[n]o misrepresentation shall avoid any contract of insurance or defeat recovery thereunder un-

less such misrepresentation was material. No misrepresentation shall be deemed material unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make such contract." Further, subdivision 4 of section 149 of the Insurance Law states that a misrepresentation that an applicant has not had previous medical treatment shall be deemed, for the purpose of determining its materiality, a misrepresentation that the applicant has not had the ailment for which treatment was given. Ordinarily, the question of materiality of misrepresentation is a question of fact for the jury *(Giuliani v Metropolitan Life Ins. Co.,* 269 App Div 376; 30 NY Jur, Insurance, § 955). However, where the evidence concerning the materiality is clear and substantially uncontradicted, the matter is one of law for the court to determine *(Reznikoff v Equitable Life Assur. Soc.,* 267 App Div 785, affd 294 NY 935; *Canestraro v Metropolitan Life Ins. Co.,* 265 App Div 676. Thus, in *Geer v Union Mut. Life Ins. Co.* (273 NY 261, 265-266), the Court of Appeals declared: "A life insurance company is free to choose the risks which it will assume. An applicant for life insurance is required to answer certain questions which are prepared for the purpose of facilitating the examination and appraisal by the company of the insurability of the risk * * * By posing the question the insurer has indicated 'that it wanted to know the facts and that it intended and expected the applicant to speak the truth so that it might acquire information concerning them. Any misrepresentation which defeats or seriously interferes with the exercise of such a right cannot truly be said to be an immaterial one.' *(Travelers Ins. Co. v. Pomerantz,* 246 N.Y. 63, 68.) * * * [w]here an applicant for insurance has notice that before the insurance company will act upon the application, it demands that specified information shall be furnished for the purpose of enabling it to determine whether the risk should be accepted, any untrue representation, however innocent, which either by affirmation of an untruth or supression of the truth, substantially thwarts the purpose for which the information is demanded and induces action which the insurance company might otherwise not have taken, is material as matter of law. The question in such case is not whether the insurance company might perhaps have decided to issue the policy even if it had been apprised of the truth, the question is whether failure to state the truth where there was duty to speak prevented the insurance company from exercising its choice of whether to accept or reject the application upon a

disclosure of all the facts which might reasonably affect its choice." As already noted, an excerpt of Provident's medical guide indicates that the company would have rejected the application had same disclosed the deceased's history of paranoid reaction. Also, Provident's present medical director, Dr. Brogan, testified that the application would have been rejected if it revealed the true medical history. Applying the test enunciated in *Geer v Union Mut. Life Ins. Co. (supra),* to the instant facts, it is concluded that the deceased's misrepresentation is material as a matter of law.

The next area of inquiry is whether Provident is estopped from urging such misrepresentation in avoidance of the insurance contract. Regulation 39 of the Insurance Department, effective November 1, 1959 (11 NYCRR 48.0 [d])[4] in a broad preamble states, *inter alia:*

"(d) * * * Some agents or brokers specialize in the sale of [high early cash value minimum deposit policies] * * * The immediate attraction to the prospect is a relatively small initial cash outlay in relation to the amount of insurance * * * The *incentive to the agent is a* high *commission* in relation to the initial cash outlay by the policyholder.

"(e) For some time minimum deposit plan policies have been of concern to the Insurance Department, not only because of *disparities* between these and other policies of similar insurance * * * but also because of *persistent complaints regarding* the sale of such policies and *the replacement of existing policies as a result of incomplete or misleading* sales illustrations and *comparisons* * * *

"(1) It is common knowledge in the life insurance business that *existing* regular policies are being *replaced* by new high cash value minimum deposit policies. *The replacement of existing insurance by new policies is generally not in the best interest of either insured or insurer* because of—among other things—the *duplication* of such acquisition expenses as medical examination, *agent's commissions,* and writing the policy. It is contended that such *replacement is at a higher level of activity than in many years. Where replacement has been effected,* as it has in many instances, *by withholding from the insured information essential to a proper decision, such prac-*

---

4. Note that the Insurance Department's numbering of its regulations differs from that employed by the Official Compilation Codes Rules and Regulations of the State of New York.

*tice is considered to be* an unfair trade practice and *detrimental to the* public interest" (emphasis supplied).

To protect the insured and the public interest, subdivision 5 of regulation 39 in effect at the relevant time herein (11 NYCRR 48.5 subsequently repealed eff Oct. 1, 1971), entitled "Safeguards against replacement of existing insurance" provides: "In connection with *all* applications for life insurance policies, *the company shall have in its files over the signature of the applicant a statement as to whether or not such policies are to replace existing insurance. Where an affirmative answer is given, it is considered in the public interest that an opportunity to present the facts to the insured be given to the insurer which issued the existing insurance so that the insured may have the benefit of all information from both companies as a basis for making a decision in his best interests.* It is the responsibility of the company as well as the agent in such cases to make absolutely certain that there is no incomplete comparison or other violation of sections 127 and 211 of the Insurance Law" (emphasis supplied).

The negligent manner with which Provident considered and approved the application of Dr. Schaefer in that the home office underwriter knew or should have known that replacement insurance was involved, had as one of its consequences, the failure on Provident's part to give Guardian an opportunity to present the facts to its insured, Dr. Schaefer, with the further result that the insured was deprived of "the benefit of all information from both companies as a basis for making a decision in his best interests." Consequently, a reasonable basis is presented by this record to conclude that Dr. Schaefer's decision to replace the incontestable Guardian policies with the Provident which is contestable was based on a lack of vital relevant information attributable to the actions and inactions of Provident and its agent, Sterling. Patently, the Insurance Department in its concern with unfair trade practices and the possible detriment posed to insureds and the public interest by replacement insurance, put the insurance industry on notice that where replacement insurance might be involved, misleading or incomplete comparisons were to be safeguarded against, communication between all concerned parties and diligent supervision were to be observed and the insured was to be protected by being supplied with *all* pertinent relevant information necessary to an informed decision. Indeed, it was and still is required that "all companies li-

censed to do business in New York State are * * * to issue written instructions promptly *to their agents* incorporating basic rules and safeguards which are to be observed in the preparation and use of cost illustrations, comparisons, advertising and other promotional material. Such written instructions are required for *the protection of the public* in order that prospects shall be furnished with *a proper, full and clear presentation* of the costs, benefits and other policy provisions * * * The *home office and the agents are to be responsible* to the Insurance Department for the observance of such rules and the proper presentation of * * * material used in New York State in the sale of policies to comply with the provisions * * * which prohibit misrepresenting the terms, benefits or advantages of any policy or contract, future dividend estimates, misleading representations and incomplete comparisons" (11 NYCRR 48.4; emphasis supplied).

Correspondence from Sterling to Dr. Schaefer preceding the Provident application evidences an intent to replace insurance.[5] Provident by following established procedures and observing its duty to Dr. Schaefer and in turn to plaintiff herein, especially in light of the Insurance Department's concern where replacement insurance is involved and the possibility that "twisting" under such circumstances could be occurring, should have initiated an investigation based upon the information admittedly in its possession. It failed to do so. This negligence resulted in Dr. Schaefer's purchasing the Provident policy sued upon herein and canceling his Guardian policies, that is, replacing the Guardian policies with the Provident policy. A clear basis for invocation of equitable estoppel precluding Provident from denying liability under this policy is thus presented. Beyond peradventure, on this record Dr. Schaefer canceled his *incontestable* Guardian policies relying on the representations, the words and conduct of Provident and its agent, Sterling, under circumstances where he was excusably ignorant of the true facts and had the right to rely on such words and conduct, and it could be reasonably anticipated that he would change his position in such a way that he would suffer injury as a consequence of such words and conduct. First, the conduct of Provident may be succinctly

5. Letter of May 26, 1967 makes reference to "the new plan" * * * "the change"; letter of June 5, 1967 refers to probability of "alter[ing] your entire insurance portfolio"; letter of June 27, 1967 states "your total insurance should be in a company where I have control."

described as culpably negligent with regard to the duty it owed Dr. Schaefer and plaintiff. It had the duty to observe customary standard procedure in considering the application and determining whether to approve same. It had the duty based upon information admittedly in its possession to initiate an investigation as to whether replacement insurance was involved and whether Dr. Schaefer was being overinsured. The mere fact that he was a doctor did not remove him from the class of prospective insureds to which this duty was owing. It had the duty to protect the applicant by notifying Guardian and by observing the requirements delineated in regulation 39 of the Insurance Department. These duties were not observed. "An estoppel may arise from culpable negligence, even in the absence of an intent to deceive or mislead" (21 NY Jur, Estoppel, Ratification and Waiver, § 49). Clearly, the transaction involved herein was one that made care and diligence a duty. "[T]o make out an estoppel on the ground of negligence, it is not enough to show that the person sought to be estopped was careless. He must have been careless in respect to some duty owing to the plaintiff or the public; there can be no estoppel based on negligence in the absence of a legal duty. Also, the neglect must be in the transaction in reference to which the estoppel is asserted and be the proximate cause of leading the party in whose behalf the estoppel is urged into the position by which he is prejudiced" (21 NY Jur, *supra*, § 49).

Second, given the expertise, knowledge and professional standing of Sterling, an agent in the employ of Provident and given the *expertise*, knowledge and position occupied by the home office underwriter, Hays, and given the public concern evinced by regulation 39 and information supplied to Hays by the Retail Credit Report, it may be concluded that they had a duty to speak, that is, to communicate in some manner to Dr. Schaefer the true state of affairs. In this scene estoppel by silence is also present and reasonably inferred from this record. "An estoppel arises from silence * * * where there is a duty to speak, and where the party upon whom the duty rests has an opportunity to speak and knowing the circumstances which require him to speak, keeps silent * * * [A]n estoppel may be predicated upon the silence of a person who knew, or ought to have known under the circumstances, that it operated to deceive another to the injury of the latter. In such a case, silence in effect is a fraud" (21 NY Jur, *supra*, § 33).

It is extremely difficult not to be overly critical of the defendants with respect to the manner in which Dr. Schaefer was sold and issued the Provident policy with the result that he canceled the Guardian policies. Provident's reliance on the material misrepresentation in that application must fall because of the public interest which must be protected where *replacement* insurance is involved. It is eminently just under the circumstances herein to safeguard the insured and his intent that his beneficiary, plaintiff herein, receive the benefit and protection of a life insurance policy of $200,000. If Dr. Schaefer had not *replaced,* that is, substituted, the Guardian policies with Provident's, plaintiff would unquestionably receive such benefit and protection. The critical factor in the exchange from the insured's and plaintiff's point of view was the loss of incontestability. Provident should not now be heard to complain that the Provident policy is being deemed in effect to be similarly incontestable.

We now consider another aspect of plaintiff's case. Provident had physically incorporated the "Supplementary Statement by Proposed Insured and Applicant" into the application. The application, as aforesaid, contained Parts I and II. The "Supplementary Statement" appeared on the reverse side of Part I on the original application. Part I of the application states above the subscription: "It is hereby declared and agreed that: (1) *this application* which *consists of Part I and Part II and any* amendments or *supplements to them* will form the basis for and be a part of any policy issued in accordance herewith" (emphasis supplied). Parenthetically, it is noted that what Provident voluntarily did in 1967, by making the supplement statement signed by the applicant part of the application, is *now* embraced within a duty imposed upon insurers by the State Insurance Department (11 NYCRR 51.5). Effective October 1, 1971, an insurer must "[r]equire *with or as a part* of each application for life insurance a statement signed by the applicant as to whether such insurance will replace existing life insurance * * * a complete list of all the applicant's existing life insurance * * * a statement signed by the agent as to whether, to the best of his knowledge, replacement is involved in the transactions". (11 NYCRR 51.5 [a] [2], [3], [4]; emphasis supplied.) There was no requirement in 1967 that such statement be required with or as a part of the application, only that the insurance in connection with the application have in its files such state-

ment. The option of making the statement part of the application therefore rested and continues to rest with the insurer. Provident exercised this option to make the "Supplementary Statement" part of the application. Not only is there a physical nexus of the "Supplementary Statement" to Part I, but Part I in item "8" requests a complete list of all life insurance on the applicant's life, in item "11" inquires whether there are any other applications for life, disability, sickness or accident insurance on the applicant's life pending or contemplated, and in item "13" requests particulars of the life insurance policy applied for. Clearly, the "Supplementary Statement" supplements these inquiries and is, therefore, supplemental to Part I. This conclusion founded in logic and reason and is reinforced by the subsequent declaration by the Insurance Department as to the duties of insurers set forth in 11 NYCRR 51.5. The information required by Part I as supplemented by the "Supplementary Statement" relate to material facts. Apparently the copy of the application attached to the issued policy received by decedent did not contain a copy of the "Supplementary Statement". Provident does not dispute this, but contends that the "Supplementary Statement" was not part of the application. However, both by virtue of its content and its physical nexus to Part I and in view of the voluntary nature of Provident's act in making such nexus; and considering the public interest explicitly set forth in regulation 39, it is concluded that such Statement is part of the application under the circumstances herein.

Subdivision 1 of section 142 of the Insurance Law provides in pertinent part: "Every policy of life * * * insurance * * * delivered or issued for delivery in this state shall contain the *entire* contract between the parties, and *nothing* shall be incorporated therein by reference to any * * * application, or other writings, unless a copy thereof is endorsed upon or attached to the policy or contract when issued. No application for the issuance of any such policy or contract shall be admissible in evidence unless a *true* copy of such application was attached to such policy when issued" (emphasis supplied). It has been aptly noted by the Court of Appeals that "[f]or many years now the Insurance Law has required that copies of applications for life insurance be attached to and returned with the policy if the insurer, during the limited period of contestability, is to be entitled to use application misstatements, even fraudulent ones, in defending against any claim

or in seeking to cancel the policy (§ 142). The purpose of the statute is to protect insureds from loss of their insurance after many years of premium payment without knowledge of infirmities in the contract, *especially when the applications are filled out by avid salesmen of insurance,* or even if the insurance is procured by their own fraud *(Archer v. Equitable Life Assur. Soc.,* 218 N.Y. 18, 22-25, discussing the predecessor section, § 58). * * * The *purpose* in furnishing copies of statements to purchasers of insurance, insureds, or beneficiaries is *to afford them,* as the case may be, the *opportunity to correct material errors,* or to expose the invalidity of the contract. Thus, *interested persons* may avoid either being misled as to the insurance protection obtained or paying premiums for years in ignorance of facts nullifying the supposed protection" *(Cutler v Hartford Life Ins. Co.,* 22 NY2d 245, 250-252; emphasis supplied; see *Lampke v Metropolitan Life Ins. Co.,* 279 N.Y. 157, 163; *Hurley v John Hancock Mut. Life Ins. Co.,* 247 App Div 547, 549; *Becker v Colonial Life Ins. Co.,* 153 App Div 382; see, also, Couch, Insurance 2d, § 4:18; cf *Helfaer v John Hancock Mut. Life Ins. Co.,* 26 NY2d 699). The failure of Provident to supply the insured with a complete copy of the application in that a copy of the "Supplementary Statement" was not attached to and returned with the policy, deprived him of the opportunity to review the information set forth on the "Statement" for accuracy and to possibly detect the variance from the information which he furnished for the Retail Credit report. To reiterate, the "Supplementary Statement" concerned the question of whether the insurance applied for was additional to or in replacement of existing insurance and contained a questionnaire, completed by the agent, concerning finances, etc. of the insured. Provident cannot be faulted for voluntarily making the "Supplementary Statement" part of the application. The public interest vested in the issue of replacement insurance received the protection and dignity to which it is entitled by this enlightened administrative act. However, this protection was vitiated by the subsequent failure to attach this "Statement" to the policy so as to alert the interested parties as envisioned by the Court of Appeals, which failure was simply another step in the unconcerned manner with which this particular application was treated. Indeed, the processing and approval of this application by the home office underwriter epitomized by a disdain for the duties owed the applicant and the plaintiff as an interested party, coupled with the demonstrated avidity of the agent in selling

insurance to the decedent, produced a reasonably forseeable result—harm to the insured and plaintiff. It is, therefore, concluded that the application for the issuance of the policy at bar is not admissible in evidence under the circumstances herein and, assuming admissibility, defendant Provident is estopped from urging misrepresentation by decedent in avoidance of the contract.

Viewing the third cause of action in light of the fact that plaintiff's motion to conform the pleadings to the proof was granted at the trial's conclusion and giving every fair intendment to the allegations of such cause, it must be concluded that the awarding to plaintiff of judgment against defendant Provident on the insurance contract itself under the first and second causes of action necessitates reversal of the judgment in plaintiff's favor against both Provident and Sterling under the third cause. Whether said cause sounds in fraud or in negligence, there are no damages sustained by plaintiff due to her recovery upon the insurance policy. It is, therefore, unnecessary to consider and resolve the legal issues raised in connection with the third cause as to whether plaintiff may maintain an action for fraud practiced upon the insured, that is, whether she could be found to have relied upon the alleged fraud, and whether the alleged harm suffered by plaintiff flowed with the requisite causation to cast defendants in liability under a negligence concept.

Accordingly, the judgment of the Supreme Court, Bronx County (TRIMARCO, J. and a jury), entered May 7, 1974, in favor of plaintiff in the sum of $200,000 against defendants should be modified, on the law, to the extent of setting aside the jury verdict against defendants on the third cause of action and dismissing said cause of action and as so modified, the judgment should be affirmed with costs and disbursements to plaintiff against Provident Mutual Life Insurance Company of Philadelphia. Defendant Sterling's appeal from the order entered on or about September 27, 1974 (TRIMARCO, J.), should be dismissed as moot.

LANE, J. (dissenting). The deceased, Dr. Louis E. Schaefer, an internist, had purchsed $200,000 worth of life insurance from Marvin S. Sterling, between the years 1960-1964. Sterling then induced Schaefer to purchase $200,000 worth of life insurance from the defendant Provident Mutual Life Insurance Company, the company for which he was then acting as agent, and Schaefer canceled his older policies. The new

policies were purchased in 1967. At that time, the older policies (taken out with an insurance carrier other than Provident) were no longer subject to contest in the event of suicide or in the event there was a material misrepresentation in the policy application. Within two years after the purchase of the Provident policies, Schaefer died, apparently a suicide.

The plaintiff, Justine Schaefer Tannenbaum, was the wife of the deceased and the named beneficiary under the Provident policies. Provident refused to honor the policy.

The amended complaint alleged three causes of action. The first is against Provident only and seeks recovery by plaintiff as a beneficiary under the policy. The second cause of action seeks equitable relief estopping Provident from disclaiming liability on the grounds of Schaefer's misrepresentations, since he was fraudulently induced to take the policies by Sterling as an agent of Provident. The third cause of action, against both Provident and Sterling, alleges fraud and deceit in that Sterling induced the change of policies by making invalid cost comparisons.

Provident's defense in refusing to honor the policy was based upon the suicide of Schaefer within two years of issuance of the policy and upon material misrepresentations which he made as to his medical history in his insurance policy application. Sterling urged that the complaint did not state a cause of action against him and, in any event, his liability is limited to commissions received.

The jury returned a verdict in favor of the plaintiff against the defendants on the first and third causes of action, and the court found in favor of the plaintiff on the second cause of action, which requested equitable relief.

At trial, it was conceded that Schaefer made misstatements as to his mental condition. He omitted in his application the fact that the had been under psychiatric care for a paranoid reaction and under treatment for diabetes mellitus. The medical guide used by Provident to determine if it would accept certain applicants as insureds indicated that applicants who had a "paranoid reaction" within two years of the application would be denied insurance coverage.

It is unnecessary to analyze whether or not Sterling as agent of Provident fraudulently induced Schaefer to surrender his old policies in favor of the new ones since, even were this to be true, the judgment in favor of the plaintiff should nonetheless be reversed and the complaint dismissed.

"Misrepresentation in an answer, by affirmation of an untruth or by suppression of the truth, is material where it *substantially* thwarts the purpose for which the information is demanded and *induces action which the insurance company might otherwise not have taken.'* The test is whether 'failure to state the truth where there was duty to speak prevented the insurance company from exercising its choice of whether to accept or reject the application upon a disclosure of all the facts which might *reasonably* affect its choice.' The question is 'not whether the company *might have issued* the policy even if the information had been furnished; the question in each case is whether the company has been induced to accept an application *which it might otherwise have refused.' " (Geer v Union Mut. Life Ins. Co.,* 273 NY 261, 271.)

While it is true that occasionally the issue of materiality of a misrepresentation or even its very existence may be for the triers of the facts *(Giuliani v Metropolitan Life Ins. Co.,* 269 App Div 376), the undisputed misrepresentations here made must be found to be material misrepresentations as a matter of law, since it was clear that, had the medical history been revealed, the application would have been rejected *(Leamy v Berkshire Life Ins. Co.,* 39 NY2d 271; *Vander Veer v Continental Cas. Co.,* 34 NY2d 50).

In the case at bar, no claim is made that Schaefer's misrepresentation was induced by fraud and, in any event, no showing was made that plaintiff as beneficiary relied on the' fraud allegedly perpetrated on Schaefer. The material misrepresentation by Schaefer operated as an efficient supervening cause and therefore damages cannot flow from any fraud allegedly perpetrated by Sterling or Provident.

Accordingly, the judgment of the Supreme Court, Bronx County, entered May 7, 1974, in favor of the plaintiff after a jury trial, should be reversed on the law and the complaint dismissed. The appeal from the order dated September 27, 1974, denying the motion of the defendant Sterling to set aside the verdict, should be dismissed as academic.

KUPFERMAN, J., concurs with LUPIANO, J.; CAPOZZOLI, J., concurs in result only; STEVENS, P. J., and LANE, J., dissent in an opinion by LANE, J., as to appeal from judgment entered May 7, 1974.

Judgment, Supreme Court, Bronx County, entered on May 7, 1974, modified, on the law, to the extent of setting aside the jury verdict against defendants on the third cause of action

and dismissing said cause of action and as so modified, the judgment is affirmed. Plaintiff-respondent shall recover of defendant-appellant Provident Mutual Life Insurance Company of Philadelphia one bill of $60 costs and disbursements of these appeals.

Appeal from order, Supreme Court, Bronx County, entered on September 27, 1974, unanimously dismissed as moot.