ANNA I. FARLEY, Respondent-Appellant, v METROPOLITAN LIFE INSURANCE COMPANY, Appellant-Respondent.

Second Department, March 30, 1987

APPEARANCES OF COUNSEL

*William J. Toppeta (Rena Friedlander* of counsel), for appellant-respondent.

*Schwartz, Blumenstein & Luchs (Morton A. Luchs* of counsel), for respondent-appellant.

## OPINION OF THE COURT

SULLIVAN, J.

On February 6, 1964, Robert T. Farley, a 38-year-old margin clerk, was issued a Metropolitan Life Insurance Company (hereinafter Metlife) family policy, number 646 201 504 M. This single document provided insurance coverage for Robert, his wife Anna and each of their three sons Michael, Dennis and Brian. The insurance on Robert was endowment insurance which would pay $3,000 to his widow in the event of his death or to him if he was still living on February 6, 2011. The insurance on his wife Anna was a combination term insurance and endowment insurance which would pay $1,080 to her husband in the event of her death before February 6, 2011, and $500 to her if she were alive on that date. The insurance on the children, including any afterborn children, was term insurance which would pay $1,000 to the parents upon the death of each child, if death occurred before the child's twenty-fifth birthday.

This policy became incontestable, except for nonpayment of premiums, two years after its date of issue. The annual premiums were $126.87 for the first five years and $149.25 thereafter. It appears that Robert Farley paid the premiums on this policy for at least 16 years and the policy was incontestable.

Sometime in September 1979 a Metlife representative Jonathan Bolos, sold Robert Farley a new joint life policy number 791 065 217 A, which was issued on October 11, 1979. This policy, in the face amount of $10,000, was on the lives of Robert and Anna and was payable upon the death of the first

of them, i.e., if Robert died first, it would pay $10,000 to Anna and if Anna died first, it would pay $10,000 to Robert. The survivor would have temporary insurance for three months, but would have no coverage thereafter. Robert and Anna signed separate applications. This policy also contained a provision for incontestability two years after the date of issue. The annual premiums on this policy were $652.90 for 18 years and $636.80 for the next 21 years.

On June 18, 1981, Robert Farley died and Anna submitted proof of death to Metlife under the joint-life policy. Since the death occurred within the two-year period of contestability, Metlife conducted an investigation, including obtaining authorizations for any medical records pertaining to Robert and Anna Farley, and they were furnished. By letter dated December 16, 1981, Metlife denied liability and declared the joint-life policy void because Anna Farley did not disclose in her application that she had been treated for hypertension and diabetes.

This law suit ensued in the Civil Court of the City of New York, Kings County. In the first cause of action, Anna Farley sought to recover $10,000 under joint-life policy number 791 065 217 A. Metlife's answer stated in effect that the joint-life policy was void because of alleged misrepresentations by Anna Farley and that the family policy had been surrendered for its cash value.

This case presents a number of questions that, in combination, seem to be without precedent. Is a joint-life insurance policy severable? Do misrepresentations of health conditions by the surviving insured under a joint-life policy void the policy on the death of the nonmisrepresenting insured? Do violations of the Insurance Department's regulations concerning the replacement of life insurance policies (11 NYCRR part 51) estop the insurance company from asserting any defenses to the claim under the joint-life policy? If the company is so estopped, is there a counterestoppel against the plaintiff from asserting a claim under the joint-life policy by reason of her misrepresentations, thereby relegating her to a claim under the family policy?

At this stage in the litigation, the record before us is inadequate to make a final determination. Metlife appears to concede some violation of the replacement regulations, without specifying the violation. It would appear, however, from this concession, that the joint-life policy was issued as a

replacement for the family-plan policy. 11 NYCRR 51.2 (b) (5) states that a policy is a replacement policy:

"(b) When new life insurance is to be purchased which is to be delivered or issued for delivery in New York and it is known to the department licensee that, as part of the transaction existing life insurance has been or is likely to be * * *

"(5) Assigned as collateral for a loan or subject to substantial borrowing of the loan value whether in a single loan or under a schedule or series of borrowing over a period of time ('substantial borrowing' includes all transactions wherein an amount in excess of 50 percent of the tabular cash value is to be borrowed on one or more existing policies)".

Robert Farley obtained a loan of $653 against his family-plan policy on October 25, 1979, which coincided with the initial premium payment of $652.90 on the joint-life policy. A second loan of $637.01 was taken against the family-plan policy on October 24, 1980, which became the primary source of the second annual premium which was paid on November 3, 1980. This supports the statements in the affidavit of Anna Farley that Metlife's agent told them that the values of the family-plan policy would cover the cost of the additional insurance. Such a procedure would indicate that the joint-life policy was in fact a replacement for the family-plan policy and subject to the requirements of 11 NYCRR part 51.

The purpose of the Insurance Department in adopting these regulations is set forth in 11 NYCRR 51.1 (b): "To protect the interests of the life insurance public by establishing minimum standards of conduct to be observed in the replacement * * * of life insurance policies, by making available full and clear information on which an applicant for life insurance can make a decision in his own best interest, *by reducing the opportunity for misrepresentation and incomplete comparison* in replacement situations, and by precluding unfair methods of competition and unfair practices" (emphasis added).

Where replacement insurance is being offered, the agent of the insurer is required to provide the applicant with a notice setting forth certain pitfalls in replacing existing life insurance (11 NYCRR Appendix 11) and also a complete disclosure statement (11 NYCRR Appendix 10) setting forth a detailed comparison of the existing and proposed policies and the relative advantages and disadvantages of each. This disclosure statement must be given to the applicant and signed by the applicant, and a copy must be left with the applicant, before

the taking of the new application (11 NYCRR 51.4 [d] [3]). The agent must submit signed copies of this disclosure statement along with any sales material used to the insurer with the application (11 NYCRR 51.4 [d] [4]) and the insurer must retain this material (11 NYCRR 51.5 [a] [5]). No disclosure statements signed by the Farleys have been submitted by Metlife.

The fact that question 12 of part A of the applications for the joint-life policy indicates that it was not to be a replacement policy is not controlling. The failure of the agent to inquire as to replacement, the incorrect recording of the answer by the agent, or the counselling of the applicant by the agent to answer this question in the negative in order to avoid the regulations is expressly prohibited (11 NYCRR 51.6).

It is apparent that there must be a full exploration of the facts and circumstances surrounding the issuance of the joint-life policy in this case. Why was a joint-life policy selected in place of the separate coverages provided in the family policy? Were the Farleys advised of the significant differences and disadvantages of the two policies? Did the Farleys want either separate policies or were they willing to take a policy on Robert, the bread winner of the family? Were the Farleys advised that they were giving up a policy which Metlife concedes was severable for one which Metlife now claims is not severable? Were the Farleys advised that they were giving up an incontestable policy for one which would be contestable for two years? It is only after these fact questions have been determined that a just resolution of this dispute can be reached.

If in fact Metlife has violated the regulations relative to replacement of life insurance policies, it may be estopped from asserting any defenses to payment of the plaintiff's claim (*Tannenbaum v Provident Mut. Life Ins. Co.,* 41 NY2d 1087, *affg* 53 AD2d 86). In *Tannenbaum,* the insured had a fully effective incontestable policy with Guardian Insurance Company (hereinafter guardian) for $200,000. When his life insurance agent changed employment from Guardian to the defendant, Provident Mutual Life Insurance Company (hereinafter Provident), he convinced the insured to replace the Guardian policy with a $200,000 policy from Provident. The agent did not explain that the new policy would be contestable for two years from the date of issue. The insured died within the contestable period and Provident denied the claim because the insured had made material misrepresentations in his applica-

tion; specifically, he had concealed a hospitalization for acute paranoid psychosis which, if known, would have resulted in a denial of the application for issuance of the policy and a lack of coverage. There was a judgment for the plaintiff after trial which was affirmed by the Appellate Division, First Department *(Tannenbaum v Provident Mut. Life Ins. Co.,* 53 AD2d 86, *supra).*

The Court of Appeals affirmed, holding that the misrepresentation by the insurer's agent as to incontestability was violative of an established public policy, in addition to being a wrong against the insured. While the court recognized that the insured was wrong in misrepresenting the state of his health and hence was in *pari delicto,* it held that the public policy aspect of the insurer's wrong estopped the insurer from asserting the insured's misrepresentations in order to defeat the claim *(Tannenbaum v Provident Mut. Life Ins. Co.,* 41 NY2d 1087, *supra).*

A few years later, the Court of Appeals again considered this question of estoppel by reason of a violation of the replacement regulations in *Trainor v Hancock Mut. Life Ins. Co.* (54 NY2d 213). In *Trainor,* the insured had permitted a number of previously issued policies to lapse for nonpayment of premiums and to be converted to paid-up term policies. The defendant's agent proposed a new policy with superior benefits, at a comparable premium, to be paid for by cashing in the paid-up term policies. In applying for this new policy, the insured concealed his hospitalization for alcoholic hepatitis and cirrhosis of the liver, conditions which would have precluded the issuance of the new policy. The insured died within the contestable period of the new policy. While recognizing that the parties were in *pari delicto* and that *Tannenbaum (supra)* applied an estoppel based on public policy to prevent the insurer from asserting the insured's misrepresentation, the Court of Appeals applied a counterestoppel against the plaintiff, to return the parties to the status quo ante, that is, reinstating the prior paid-up term policies and permitting the plaintiff to claim under these.

A careful reading of *Tannenbaum* and *Trainor (supra)* reveals that the Court of Appeals balanced the equities of the parties in reaching its conclusions. In both cases the insured misrepresented the state of his health and it was his death within the contestable period that gave rise to the claim. In both cases the insurer's agent failed to advise the insured that there would be a new contestable period. In *Tannenbaum,* the

new policy was in the same face amount as the old, albeit at more favorable premiums, but was with a different company. If Provident could avoid the claim, the insured's beneficiary would be unable to collect either under the new or the old policy. The court held that under such circumstances the insurer's misconduct so outweighed the insured's misconduct as to warrant the application of a public policy estoppel against the insurer. In *Trainor*, however, the new policy was in a greater amount, the premiums were comparable and the policies were with the same company. The relative misconduct of the parties was nearly equal and the insured's beneficiary was not without a remedy through the reinstatement of the earlier policies.

The situation in the present case is quite different. While the face amount of insurance was slightly more than three times higher in the new policy, the annual premiums were approximately four times higher. There was no misrepresentation as to the state of health of the insured whose death gave rise to the claim. The possible violation of the replacement regulations involved not simply incontestability of the policies but the very nature of the coverages provided by the two policies and that a severable policy was being replaced by one which was not considered severable by the insurer. Under such circumstances, a jury could find that the conduct of the insurer was so egregious as to warrant the imposition of a public policy estoppel against the insurer so as to preclude it from contesting the plaintiff's claim that the joint-life policy was severable. It would follow that if this policy is severable, the defendant would have to pay the face amount of $10,000 upon the death of Robert Farley, since Robert did not misrepresent the state of his health in the application (7 Couch, Insurance 2d § 35:163 [rev ed]; *Wilkinson v Standard Acc. Ins. Co.*, 180 Cal 252, 180 P 607).

On the other hand, if the jury were to find that there was no misrepresentation or failure to inform as to severability, but solely as to incontestability, the *Trainor* result could apply, particularly in view of the fact that the insurer was the same on both policies. The parties could be restored to their positions before the joint policy was issued and the plaintiff would obtain judgment on her second cause of action under the family-plan policy.

For these reasons, the order of the Appellate Term (125 Misc 2d 37) should be reversed insofar as appealed from, the order of the Civil Court of the City of New York, Kings

County, denying the defendant's motion for summary judgment, should be affirmed, and the matter should be remitted to the Civil Court for further proceedings consistent with this decision.

BROWN, J. P., RUBIN and KOOPER, JJ., concur.

Ordered that the order of the Appellate Term for the Second and Eleventh Judicial Districts, dated August 2, 1984, is reversed insofar as appealed from, on the law, without costs or disbursements, the order of the Civil Court, Kings County, dated December 12, 1983, is affirmed in its entirety, and the matter is remitted to the Civil Court of the City of New York, Kings County, for further proceedings consistent herewith.