**In re SEPTEMBER 11TH LIABILITY INSURANCE COVERAGE CASES**

**No. 03 CV 332(AKH).**

United States District Court, S.D. New York.

March 1, 2004.

---

Bruce A. Baird, Richard A. Beckmann, Mitchell F. Dolin, Neil K. Roman, Covington & Burling, Washington, DC, for UBS Warburg Real Estate Investments, Inc.

Christopher T. Bradley, Marshall, Conway & Wright, PC, New York City, for General Star Nat. Ins. Co.

Thomas W. Bruner, Thomas S. Garrett, Leslie A. Platt, Gary P. Seligman, Keith S. Watson, Wiley, Rein & Fielding, L.L.P.,

Washington, DC Brian James Carey, Kevin T. Coughlin, Todd Harris, Robert K. Kelly, McElroy, Deutsch & Mulvaney, LLP, New York City, for Zurich American Ins. Co.

James W. Carbin, Duane, Morris, L.L.P., Neward, NJ, for Great American Ins. Co.

Nancy Sher Cohen, Heller, Ehrman, White & McAuliffe, Los Angeles, CA, Nancy Sher Cohen, Heller, Ehrman, White & McAuliffe, New York City, Stephen N. Goldberg, Heller, Ehrman, White & McAuliffe, San Francisco, CA, Edward Michael Joyce, Heller, Ehrman, White & McAuliffee, New York City, for GMAC Commercial Mortg. Corp.

William T. Corbett, Jr., Drinker Biddle & Shanley, L.L.P., Florham Park, NJ, for Nat. Union Fire Ins. Co. of Pittsburgh, PA.

Louis G. Corsi, Landman Corsi Ballaine & Ford P.C., New York City, for U.S. Fire Ins. Co.

Stuart Cotton, Mound, Cotton, Wollan & Greengrass, New York City, for Starr Excess Liability Ins. Co.

Ariel Michael Furman, Kaufman, Borgeest and Ryan, LLP, New York City, for Certain Underwriters at Lloyds, London.

Judith F. Goodman, Goodman & Jacobs, L.L.P., New York City, for Federal Ins. Co.

Edward J. Grass, Shaw Pittman LLP, McLean, VA, for St. Paul Fire and Marine Ins. Co.

Keith Harris, Office of Milton H. Pachter, New York City, Randy Paar, Dickstein, Shapiro, Morin & Oshinsky LLP (NY), New York City, for Port Authority Trans-Hudson Corp.

Christopher W. Healy, John P. Hooper, Edwards & Angell, L.L.P., New York City, for Lexington Ins. Co.

James Eric Keller, Mayer, Brown, Rowe & Maw LLP, New York City, for Westfield WTC Holding, LLC.

Bernard London, London, Discher, LLP, New York City, for Great American Ins. Co.

Noah Nunberg, L'Abbate,Balkan, Colavita & Contini, LLP, Garden City, NJ, for Ohio Cas. Ins. Co.

Frederick W. Reif, Riker Danzig Scherer Hyland & Perretti LLP, New York City, for Gerling Konzern Allgemeine Versicherungs AG.

William M. Savino, Rivkin, Radler, L.L.P., Uniondale, NY, for Axa Corporate Solutions.

William A. Schreiner, Jr., Shaw, Pittman, L.L.P., McLean, VA, for Athena Assur. Co.

Edward D. Tanenhaus, New York City, for 1 World Trade Center Holdings, LLC.

Mark R. Vespole, Tressler, Soderstrom, Maloney and Priess, Newark, NJ, for Lumberman's Mut. Cas. Co.

### OPINION AND ORDER DENYING RULE 12(c) MOTIONS AS TO INSURANCE COVERAGE

HELLERSTEIN, District Judge.

The terrorist-related aircraft crashes of September 11, 2001, causing 2,749 deaths, and many injuries at the World Trade Center, gave rise to numerous lawsuits against the owner and lessees of the World Trade Center properties. The owner and lessees, in turn, have made demands on the insurance companies they allege are obligated to defend them in these lawsuits. I discuss in this opinion whether and to what extent the owners and lessees are entitled to the status and benefits of an "insured" under applicable insurance documents and whether New York law requires the insurer to defend the lawsuits under the coverage.

*Background*

The Port Authority of New York and New Jersey (Port Authority) owned and operated the properties constituting the World Trade Center until approximately July, 2001. Then, the Port Authority entered into lease agreements with five entities (the Net Lessees) to lease the Twin Towers (One and Two World Trade Center), two office buildings known as Four and Five World Trade Center and the World Trade Center Retail Mall. An entity affiliated with the Net Lessees, World Trade Center Properties LLC (WTCP), obtained binders from Zurich American Insurance Company (Zurich), for a primary Commercial General Liability Policy (CGL Policy) and a Commercial Umbrella Policy (Umbrella Policy) (together, the Policies) for the leased properties. As of September 11, 2001, only Zurich's binders were in place, which listed only WTCP as the "named insured." The actual Policies were issued after September 11th. Other insurance carriers issued policies for amounts of coverage in excess of Zurich's coverage (Excess Carriers).

Following the September 11, 2001 attacks, the legal successors of those who died, and many of those who were injured, brought suit to recover damages for breaches of duties of care owed to the decedents and the injured. *See e.g., Broghammer v. United Airlines, et al.,* 02 Civ. 7174(AKH), *Baksh v. American Airlines, Inc. et al.,* 02 Civ. 7224(AKH), and *Friedlander v. United Airlines, et al.,* 02 Civ. 7171(AKH) (Underlying Cases), consolidated in *In Re September 11th Litigation,* 21 MC 97(AKH). These Underlying Cases named multiple defendants, including the

Port Authority and WTCP.[1] WTCP brought a third-party action against Zurich for declaratory relief regarding Zurich's obligations to itself and to other asserted insureds, including the Port Authority. Zurich filed a fourth-party action and an original complaint against WTCP, the Port Authority, the Net Lessees and the Excess Carriers, among others, raising the same issues. The third- and fourth-party actions were consolidated for pretrial proceedings in *In Re September 11th Liability Insurance Coverage Cases,* 03 Civ. 0332(AKH).

The Port Authority and WTCP now bring motions under Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings with regard to basic issues of their insurance coverage: (1) whether the Port Authority is entitled to the status of an "Additional Insured" and if so, what is the scope of that coverage; and (2) whether New York insurance law requires the Policies, which exclude defense costs, to provide for a defense and, if so, what consequences follow. The moving parties claim that they are in urgent need of the relief they seek because of the substantial costs they have incurred, and continue to incur, in defending the underlying September 11th litigation. The insurance carriers argue that the motions cannot be resolved without making factual determinations of disputed issues, and that much more discovery is needed.

For the reasons discussed in this opinion, I deny both motions. I hold that the Binder, as the applicable document, is ambiguous regarding whether the Port Authority was intended as an Additional Insured, and that it is premature to determine the scope of any such coverage. And I hold that New York Insurance Law and Regulations, as applied to the circum-

stances before me, do not require me to rewrite Zurich's Binder and Policies to include an obligation to defend WTCP.

*Discussion*

### A. Jurisdiction

The parties in the Underlying Cases assert jurisdiction based on The Air Transportation Safety and System Stabilization Act (the Act). *See* 49 U.S.C. § 40101, Pub.L. No. 107–42, 115 Stat. 230, 240 (Sept. 22, 2001), as amended by Pub.L. No. 107–71, § 201, 115 Stat. 597, 645 (Nov. 19, 2001). The Act contains five principal titles. *Id.* Four of the titles grant the airline industry financial and tax assistance. Title IV is entitled "Victim Compensation" and its stated purpose is to provide adequate compensation for those who were killed or injured in the September 11 attacks while protecting the airline industry and other entities from the crushing liability that likely would have resulted from lawsuits. The Act at § 403. To further these goals, the Act limits damages to the amount of liability insurance carried by certain defendants, including air carriers and persons with a property interest in the World Trade Center. *Id.* at § 408(a)(1). The Act also creates "a Federal cause of action for damages arising out of the hijacking and subsequent crashes ... on September 11, 2001," § 408(b)(1), and provides that the substantive law for such suits is to be the state law where the crash occurred unless preempted by federal law. *Id.* at § 408(b)(2). The Act bestows "original and exclusive jurisdiction" upon this court "over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or related to the terrorist-related aircraft crashes of September 11, 2001." § 408(b)(3).

---

1. Plaintiffs in the Underlying Cases initially sued Silverstein Properties LLC. WTCP was identified as the correct defendant in a Stipulation and Order dated January 29, 2003.

The liability insurance cases present the issue of whether this court has subject matter jurisdiction over third- and fourth-party claims involving the primary insurance policies of defendants in the Underlying Cases. Generally, Congress has the power to extend federal court jurisdiction to cases arising under the Constitution or the laws of the United States. U.S. Const. art. III, § 2; *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 491, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *World Trade Ctr. Props. LLC v. Hartford Fire Ins. Co.,* 345 F.3d 154, 164 (2d Cir.2003). Claims involving solely issues of state law generally fall outside these boundaries. *World Trade Ctr. Props. LLC,* 345 F.3d at 164 (quoting *Verlinden,* 461 U.S. at 491, 103 S.Ct. 1962). Nonetheless, a grant of jurisdiction, even over state law claims, may be constitutionally permissible if it "raises questions of substantive federal law." *Verlinden,* 461 U.S. at 493, 103 S.Ct. 1962.

■ Although the parties agreed that this court has subject matter jurisdiction, I, nonetheless, raised the issue of jurisdiction and asked for briefs because of my independent duty to determine if subject matter jurisdiction exists. *Wynn v. AC Rochester,* 273 F.3d 153, 157 (2d Cir.2001) ("Parties cannot confer subject matter jurisdiction where the Constitution and Congress have not."). The parties argue that the third- and fourth-party claims arise under both the laws of the United States and the supplemental jurisdiction of this court. I hold that supplemental jurisdiction exists, and exercise jurisdiction only on this basis.

When a federal question provides a district court with original jurisdiction, the court may exercise supplemental jurisdiction over claims that lack an independent jurisdictional basis, but are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III" of the Constitution. 28 U.S.C. § 1367(a). The requirement is not necessarily rigorous; "a loose factual connection" can suffice to satisfy the constitutional requirement. *Jones v. Ford Motor,* 358 F.3d 205, 213 (2d Cir.2004) (quoting Judge Easterbrook's decision in *Channell v. Citicorp Nat'l Servs.,* 89 F.3d 379 (7th Cir. 1996)).

The Second Circuit, in the context of permissive counterclaims, recently held that section 1367 displaced, rather than codified, the concepts of ancillary and pendant jurisdiction first articulated by the Supreme Court in *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *See Jones v. Ford Motor,* 358 F.3d 205·(2d Cir.2004). *Gibbs* extended jurisdiction to cases where federal and state claims "derive[d] from a common nucleus of operative fact ... and would ordinarily be expected to [be tried] in one judicial proceeding." 383 U.S. at 725, 86 S.Ct. 1130. It remains an open question whether the Gibbs "common nucleus" standard defines the full breadth of Article III, and, thus, whether any factual relationship is required for claims to be a "case or controversy." *Ford Motor,* 358 F.3d at 213 n. 5.

As I have previously held, the Underlying Cases arise out of and involve injury or death resulting from "the hijacking and subsequent crashes ... on September 11, 2001," and thus state a cause of action under section 408(b). *See In re September 11 Litigation,* 280 F.Supp.2d 279, 287–88 (S.D.N.Y.2003); *In Re World Trade Center Disaster Site Litigation,* 270 F.Supp.2d 357 (S.D.N.Y.2003). The Underlying Cases fall within the constitutional boundary because they raise substantive questions of federal law. *Verlinden,* 461 U.S. at 493, 103 S.Ct. 1962. Numerous ques-

tions have and will continue to arise regarding the Act itself, requiring decisions by this court to interpret the various provisions of the Act. *See e.g., In re September 11th Litigation,* 2003 U.S. Dist. LEXIS 23561 (S.D.N.Y.2003) (construing what it means to file a claim with the Victim Compensation Fund under the Act); *see also Verlinden,* 461 U.S. at 492, 103 S.Ct. 1962 (questioning whether jurisdiction is constitutional over a case that presents a remote possibility of involving substantive federal law).

To exercise supplemental jurisdiction, the consolidated insurance cases must "form part of the same case or controversy" as the Underlying Cases. 28 U.S.C. § 1367(a). The unique statutory framework of the Act makes the primary liability insurance a part of any case or controversy brought for damages under it. The Act at § 408(a)(1). The Act limits liability for claims against certain defendants related to the terrorist attacks of September 11th to the amount of liability insurance a defendant carried. *Id.* Congress originally passed the Act to limit the liability of air carriers but later amended it to extend protection to any "person with a property interest in the World Trade Center." *Id.* Thus, the scope and extent of the defendants' liability coverage, and whom the policies cover, are crucial to the dispositions of the Underlying Cases. *See Grimes v. Chrysler Motors Corp.,* 565 F.2d 841, 844 (2d Cir.1977) (finding ancillary jurisdiction appropriate where property or assets are "constructively drawn into the court's possession or control by the principal suit.") (quoting *Fulton National Bank of Atlanta v. Hozier,* 267 U.S. 276, 280, 45 S.Ct. 261, 69 L.Ed. 609 (1925)).

In addition, the Act vests the Southern District of New York with "original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death)" arising from the September 11th attacks. *Id.* at § 408(b)(3). This court's exclusive jurisdiction over the Underlying Cases further supports supplemental jurisdiction. A state court would not have the power to hear the whole dispute. Thus, if I declined to exercise supplemental jurisdiction and no independent basis for jurisdiction is found, this dispute would have to be filed in state court and heard separately and apart from the cases that control claims made under the policies. This would contradict Congress' desire for uniformity and expertise in dealing with these cases. *See* 147 Cong. Rec. S. 9589, 9594 (Sept. 21, 2001), 9594 (remarks of Sen. McCain) ("the bill attempts to provide some sense to the litigation by consolidating all civil litigation arising from the terrorist attacks of September 11 in one court"); *id.* at 9595 (remarks of Sen. Hatch) ("we consolidated the causes of action in one Federal court so that there will be some consistency in the judgments awarded"). Requiring a state court to hear this case would create the possibility of inconsistent and inefficient judgments regarding the amount of damages available to plaintiffs in the Underlying Cases. *See Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG,* 335 F.3d 52, 55 (2d Cir.2003).

Furthermore, courts generally have found that claims involving an insurer's duty to defend and indemnify an insured are factually related to underlying loss claims. *See Garfield Slope Housing Corp. v. Public Serv. Mut. Ins. Co.,* 973 F.Supp. 326, 330 (E.D.N.Y.1997) (exercising supplemental jurisdiction over policyholder's third-party complaint against an insurer for defense and indemnification); *Bruce v. City of Middletown,* 781 F.Supp. 1013, 1016 (S.D.N.Y.1992) (exercising supplemental jurisdiction over defendant's third-

party claim for contribution and indemnification).

Section 1367 contains certain exceptions to the exercise of supplemental jurisdiction, however. One exception applies to diversity jurisdiction, and thus is not pertinent to this case. 28 U.S.C. § 1367(b). Another exception provides district judges with discretion to decline to exercise supplemental jurisdiction where (1) a claim presents "a novel or complex issue of state law," (2) a state claim "substantially predominates" over federal claims, (3) all of the federal claims have been dismissed, or (4) exceptional circumstances compel a judge to refrain from exercising jurisdiction. 28 U.S.C. § 1367(c). While the claims before me present novel and complex issues of state law, the arguments in favor of my retaining jurisdiction of these insurance cases are considerably stronger.

An additional concern arises in exercising supplemental jurisdiction over the asserted claims as I separated those claims from the Underlying Cases and consolidated them. This does not present an insurmountable hurdle, however. Consolidation does not merge cases or change the rights of the parties. *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–97, 53 S.Ct. 721, 77 L.Ed. 1331 (1933); *Katz v. Realty Equities Corp.*, 521 F.2d 1354 (2d Cir.1975). Consolidation occurs generally for the convenience, administration and economy of the court and parties. *Johnson*, 289 U.S. at 496, 53 S.Ct. 721. Separating claims for such purposes, however, does not sever them from their underlying actions. Thus, consolidated claims may still establish subject matter jurisdiction based on supplemental jurisdiction from the underlying case. Consolidated cases "remain as independent as before, and if one hangs for its jurisdiction upon the other, consolidation adds nothing; the dependent jurisdiction is as good without it." *Johnson v. Manhattan R. Co.*, 61 F.2d 934, 940 (2d Cir.1932) (Learned Hand, J.) *aff'd, Johnson*, 289 U.S. at 496–97.[2]

I therefore find that exercising supplemental jurisdiction over the consolidated actions pursuant to section 1367(a) is reasonable and proper.

I am aware of cases showing reluctance to extend federal question jurisdiction to breach of contract suits by an insurer against a reinsurer and to claims to establish liability coverage over losses distant from the event and place of the attacks. *See e.g., Canada Life*, 335 F.3d at 59; *Int'l Fine Art & Antiques Dealers Show Ltd v. ASU Int'l, Inc.*, 2002 U.S. Dist. LEXIS 10878 (S.D.N.Y. June 19, 2002). In two cases involving disputes between reinsurers, the Second Circuit held that the claims did not arise from the terrorist-related attacks of September 11, 2001, and raised "secondary," not primary, issues. *Canada Life*, 335 F.3d 52, 57, 59; *Combined Ins. Co. of Am. v. Certain Underwriters at Lloyd's*, 75 Fed.Appx. 799, 800, 2003 WL 21999454, *1 (2d Cir.2003) (unpublished opinion); *see also Associated Aviation Underwriters v. Arab Ins. Group*, 2003 WL 1888731, at *7 (S.D.N.Y. Apr. 16, 2003) (reinsurance claims were not the disputes Congress intended the Act to benefit). Additionally, Judge Denise L. Cote found that the Act did not extend jurisdiction to a contract dispute over the cancellation of an antique show scheduled nearly two weeks after the attacks and six miles from the site. *International Fine Art & Antique Dealers*

2. I note that supplemental jurisdiction cannot support Zurich's amended complaint originally filed in action 03 Civ. 332. The claims and parties in the complaint are identical to Zurich's fourth-party action, however, and thus, may be decided even if the amended complaint lacks jurisdiction, a question I do not decide.

*Show Ltd v. ASU Int'l, Inc.*, 2002 WL 1349733, 2002 U.S. Dist. LEXIS 10878 (S.D.N.Y. June 20, 2002).

These are cases that are only tangentially related to the September 11th attacks, and involve claims for damages that did not arise out of the attacks. The Act at § 408(b)(1). The meaningful inquiry is whether a court must "refer to or choose among competing descriptions of the *events* of September 11th itself-a circumstance that otherwise creates the possibility of inconsistent and inefficient judgments ... which is what section 408(b)(3) truly seeks to avoid." *Combined Ins.*, ·75 Fed. Appx. 799, 801, 2003 WL 21999454 at *2 (emphasis in original) (construing *Canada Life*, 335 F.3d 52). The need to avoid inconsistency and inefficiency between the issues of the Underlying Cases and the defendants' cases against their insurers, is the very argument for exercising supplemental jurisdiction. And since I find that supplemental jurisdiction provides the basis for subject matter jurisdiction, I need not and do not decide if there is also an independent basis for jurisdiction under the Act. *See World Trade Ctr. Props.*, 345 F.3d at 164.

### B. Standard for Motions Under Rule 12(c)

The standard for determining a Rule 12(c) motion for judgment on the pleadings is identical to that for a Rule 12(b)(6) motion for failure to state a legally sufficient claim for relief. *Irish Lesbian &*

*Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir.1998); *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994). For both motions, the district court must accept all allegations in the complaint as true and draw all inferences in favor of the non-moving party. *Irish Lesbian & Gay Org.*, 143 F.3d at 644. The court should not dismiss a claim unless it is satisfied that the complaint cannot state any set of facts that would entitle the plaintiff to relief. *Sheppard*, 18 F.3d at 150.

Documents referred to in the complaint, explicitly or by reference, may also be considered. *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001). In this case, the parties have supplemented their pleadings by filing detailed contentions and certain historical, and non-disputable, facts. These, also, may be considered. *See* Hearing Tr. (Oct. 9, 2003) at 34: 13–16; F.R.C.P. 12.

### C. The Insurance Binder, not the Insurance Policy, is the Effective Instrument

■ As of September 11, 2001, Zurich's Binder was the only written contractual commitment between the parties. It was not until November 16, 2001 and January 31, 2002, months later, that Zurich issued its formal insurance policies. The threshold question is which is the operative document, the Binder or the Policies.

■ Under New York law, the law that governs,[3] an insurance binder is a

---

**3.** "A federal court ... adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir.1989) (citing *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). "Under New York's choice-of-law rules, when determining which law to apply to a contract dispute, the court evaluates the

center of gravity ... with the purpose of establishing which state has the most significant relationship to the transaction and the parties." *Specht v. Netscape Communications Corp.*, 150 F.Supp.2d 585, 590 (S.D.N.Y.2001) (quoting *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir.2001) (citing *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (N.Y.1994))). As the Binders and Poli-

separate contract that provides interim insurance until the final policy is issued or refused. *Springer v. Allstate*, 94 N.Y.2d 645, 710 N.Y.S.2d 298, 731 N.E.2d 1106, 1108 (2000). When a loss occurs prior to finalization of an insurance policy, the binder in effect at the time of the loss governs. *World Trade Ctr. Props.*, 345 F.3d 154, 183 (2d Cir.2003). In the case at bar, the binder is the governing contract.

■ A binder, although an incomplete document, may nonetheless be binding. *World Trade Ctr. Props.*, 345 F.3d at 169. Since the parties necessarily intend that insurance should become effective at the inception of an insurable risk, even though it may take some time before a formal policy is prepared and issued, New York courts recognize that terms customary and reasonable to such insurance should be implied to complete the binder, and to express a binding insurance contract until a formal policy is issued or refused. *Id.* "To determine the contents of a binder, New York courts generally look to (1) the specific terms contained in the binder or incorporated by reference, and (2) to the extent necessary as gap-fillers, the terms included in the usual policy currently in use by the insurance company or those required by statute." *Id.* (citing *LaPenta v. Gen. Acc. Fire & Life Assurance Corp.*, 62 A.D.2d 1145, 404 N.Y.S.2d 182, 184 (4th Dep't 1978)). Courts will also look to the parties' negotiations to determine what terms the parties intended to incorporate in the binder. *World Trade Ctr. Props.*, 345 F.3d at 169.

### D. The Port Authority's Status According to the Terms of the Binder

The Port Authority seeks judgment declaring that it is an "Additional Insured" under the Zurich policies, and declaring that coverage extends to the full scope of its potential liabilities arising out of the ownership, maintenance or use of the World Trade Center. I discuss each question in turn.

Larry A. Silverstein, a New York real estate developer, successfully negotiated to lease the World Trade Center properties from the Port Authority. He carried out his negotiations through one or more wholly owned companies, among them, Silverstein Properties, Inc., a New York corporation. To hold the leaseholds from the Port Authority, he created a structure of limited liability companies organized under Delaware law. Four such companies became the Net Lessees: 1 World Trade Center LLC and 2 World Trade Center LLC for the Twin Towers; and 4 World Trade Center LLC and 5 World Trade Center LLC for office buildings known by those names.[4] Each Net Lessee has one member, its manager, one of another set of limited liability companies: 1 WTC Holdings LLC, 2 WTC Holdings LLC, etc., respectively. The managing companies were in turn owned and controlled by World Trade Center Properties LLC (WTCP). Silverstein beneficially owned one-third of WTCP and controlled the entire owning structure through still more limited liability companies organized under Delaware law: Silverstein WTC LLC, which he owned entirely and Silverstein WTC Properties LLC, of which he owned

cies were negotiated and issued in New York by an authorized New York insurance company for properties within the state. New York clearly has "the most significant relationship to the transaction and the parties." *Id.*

4. Additionally, Westfield WTC LLC, an entity apparently not affiliated with Silverstein, leased the World Trade Center Retail Mall from the Port Authority. Westfield, while a party, does not join in this motion by the Port Authority.

a third. The Silverstein structure, as produced by WTCP, is set out as Appendix A to this opinion.

Zurich issued binders on July 18, 2001 for the CGL Policy and July 19, 2001 for the Umbrella Policy. At Silverstein's insurance broker's request, each identified "Silverstein Properties, Inc./World Trade Center" as the named insured. On the second page of the CGL Policy Binder, a section entitled "Coverage Extensions/Exclusions," listed three general categories of Additional Insureds: "Where Required Under Contract or Agreement;" "Managers or Lessors of Premises;" and "Vendors." The Umbrella Coverage Binder made no mention of additional insureds.[5]

A few days after issuing the Binders, Zurich amended the CGL Binder in response to Silverstein's broker's request to identify "World Trade Center Properties LLC" as the named insured, instead of "Silverstein Properties, Inc./World Trade Center." The record shows that Silverstein's broker continued to explore how precisely to name the insured and additional insureds for the Policies, and how to take into account the Port Authority's sovereign immunity concerns in identifying it as an Additional Insured, but there is no indication that the broker communicated any of these explorations or concerns to Zurich before September 11, 2001.

The Port Authority argues that it is an Additional Insured under Zurich's binder, as a "Manager[ ] or Lessor[ ] of the Premises," even if it was not identified by name specifically. It argues that the clear meaning was to extend coverage to the managers or lessors of the World Trade Center and that since the Port Authority is the lessor it is included under this coverage.

Zurich concedes in its pleadings, as it must, that the Port Authority is the lessor of the World Trade Center. Zurich Am. Compl. ¶ 14 ("As the owner and lessor of the World Trade Center Properties, the Port Authority may be afforded some coverage under the Policies."). Zurich's argument is based not on the facts of ownership and lease of the World Trade Center properties, but on the absence of evidence that the parties intended to name the Port Authority as an Additional Insured, and that the Port Authority was not the lessor of the insured party, WTCP, but of an entity that WTCP individually owned, the Net Lessees.

■ Zurich's CGL Binder provides that coverage was to be either extended to, or excluded from, certain categories of Additional Insureds, among them, "Managers or Lessors of the Premises." Zurich argues that the disjunctive wording–either extending, or excluding, coverage–presents an ambiguity, that it had received no instruction from Silverstein or his insurance broker to add the Port Authority as an Additional Insured, and that the issue should not be resolved by a Rule 12 motion without adequate discovery. The argument, although generally unpersuasive for it is illogical that the parties would have identified a category of insured party if they had intended to exclude just such coverage, presents enough ambiguity to cause me to deny the Rule 12 motion. It is possible that the binder was intended to present formal possibilities for the parties to eliminate or include, which they had not done before the loss took place.

Ambiguity exists where a contract term "could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the

---

5. Under the Umbrella Policy, coverage follows the form of the CGL Policy. Thus, any umbrella coverage must derive from the CGL Policy.

context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *World Trade Ctr. Props.*, 345 F.3d at 184 (quoting *Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir.2000)). A term may be ambiguous in one factual context but not in another. *World Trade Ctr. Props.*, 345 F.3d at 184 (internal quotations omitted). In construing an insurance contract, the court should look to the parties' intentions; terms should be given ordinary meanings and courts should avoid absurd results. *Id.*

The Policies, which were issued after the loss in November 2001 and January 2002, shed some light on the parties' intentions, even though not binding. *See World Trade Ctr. Props.*, 345 F.3d at 184. "The Additional Insured Schedule" (Endorsement) included in the CGL Policy is of particular assistance. Although it does not entirely remove the indefiniteness regarding the "Insured" and the "Additional Insured(s)," it adds to the persuasive quality of WTCP and the Port Authority's arguments.

The CGL Policy Endorsement provides, under the category "Additional Insured" that "Managers of Lessors of Premises" qualify as such. The Endorsement in Part 1, under "Designation of Premises," provides that the premises leased to WTCP constitute the premises covered by the insurance. The Endorsement, adding further clarification that the Port Authority is the intended Additional Insured, provides that the insurer shall not invoke any defense based on the Port Authority's governmental immunity or the Net Lessee Association's protection thereunder without the express permission of the Port Authority. Finally, the clause provides that the "endorsement shall not limit, vary,

change, or affect either the protections afforded the Port Authority as an additional insured or the protections afforded the Port Authority under the contractual liability endorsement." However, in Part 2 of the Endorsement, under the heading "Name of Person or Organization (Additional Insured)," where the reader might expect the name of the Port Authority, and possibly other Silverstein entities, to be identified, the phrase "If Any" appears, once again adding to the uncertainty of the Port Authority's motion. Part 3 of the CGL Policy, providing the premium cost of the additional insurance, provides, under the heading "Additional Premium," the phrase "INCL," suggesting one of two possibilities: either the Port Authority brought no additional risk, therefore no additional premium; or conversely, no additional premium was charged because the parties did not intend to include an Additional Insured. Part 3 also provides, in answer to the question, "Who Is An Insured," the following answer: "the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to [WTCP] and shown in the Schedule and subject to" certain named exclusions, including occurrences that take place after the lease ends. Again, there is an ambiguity; no party is identified in the Endorsement, yet the phrase implies that the parties intended to add Port Authority as an Additional Insured.

All this is persuasive that the parties intended the Port Authority, as lessor of the premises, to be covered as an Additional Insured. But, without evidence of the parties' communications to each other and evidentiary support regarding custom and Zurich's practice, I hesitate so to rule on a Rule 12 motion. I remind the parties. however. before they incur the substantial expenses of discovering issues that appear

rather evident, that the Federal Rules of Civil Procedure are intended, not to provide carte blanche for all conceivable discovery, but only so much as is reasonable and appropriate to the speedy, just and efficient determination of the issues. *See* F.R.C.P. 1 (The rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action.").

Zurich additionally argues that since the lease agreements are between the Port Authority and the Net Lessees–not WTCP, the name insured–nothing on the record shows that the Port Authority is WTCP's lessor. The Net Lessees, it will be recalled, are 1 World Trade Center Properties LLC, 2 World Trade Center Properties LLC, and so forth; the sole member and manager of each net lessee is 1 WTC Holdings LLC; 2 WTC Holdings LLC, respectively; WTCP LLC is the sole member of each of these Holding companies.

The apparent intent of the Binder and subsequent Policies was to provide coverage for the entity having primary legal and financial responsibility for the leased World Trade Center properties. The properties are leased to the Net Lessees, however, not WTCP. The lease agreements have not been made a part of the record, and without them, the resolution of the issues presented to me would be somewhat speculative, certainly so on a Rule 12 motion. Did the leases, for example, require the Net Lessees and/or entities owning them to indemnify and insure the Port Authority, and were the leases exhibits to Zurich, or the subject of comment or explanation to Zurich, to support an argument that the parties intended the Port Authority to be covered as an Additional Insured. The material omissions and discrepancies are difficult to understand

where the financial stakes were so large and the parties so sophisticated. Nonetheless, a Rule 12 motion does not present the proper context to resolve the ambiguities. At this point in time, relatively early in the pre-trial proceedings. and in light of the many parties involved, the public interest in all aspects of the September 11 cases. and the complexity of the issues, I accept Zurich's argument that sufficient ambiguity exists to cause this branch of the Port Authority's Rule 12 motion to be denied.

Accordingly, I deny this branch of the Port Authority's motion, without prejudice to renewal after the record is more properly developed.

The next branch of the motions before me involves the scope of any coverage afforded to Additional Insureds, whether confined to issues of vicarious liability, arising "out of the ownership, maintenance or use of that part of the premises leased," or extending to all aspects of the Port Authority's potential liability from the September 11 litigation. Since at this stage the parties will be engaged in discovery with regard to the issue of the Additional Insured and, presumably, that discovery will extend to the scope of coverage of such Additional Insured, it is premature to treat that question now. Accordingly, I deny this branch of the Port Authority's Rule 12 motion as well, again, without prejudice to renewal.

E. *Concerning Zurich's Obligation to Defend WTCP*

WTCP seeks partial judgment on the pleadings that Zurich is obligated to provide coverage for defense costs under the CGL Policy pursuant to New York State Insurance Regulation 107 (Regulation 107). 11 N.Y.C.R.R. § 71 (2003).[6] Zurich and Lumbermens Mutual Casualty Company

---

6. WTCP's motion does not raise the issue of    defense costs under the Umbrella Policy.

(Lumbermens), an excess carrier, oppose the motion. At my invitation, the New York State Insurance Department submitted an amicus brief. Zurich, Lumbermens and The American Insurance Association, as amicus, filed opposition responses to the Insurance Department's submission.

WTCP concedes the facts as Zurich represents them, and I also must accept as true the facts pleaded by Zurich for purposes of the motion. *Irish Lesbian & Gay Org.*, 143 F.3d at 644. Thus, the record shows, at this point, before discovery is complete, that Silverstein originally sought conventional insurance coverage for the World Trade Center, including coverage for defense costs, but was unable to secure such coverage from any insurer. Insurers were unwilling to write conventional coverage for the World Trade Center because the property lacked historic defense cost data, and uncertainties existed regarding how, if at all, the Port Authority's governmental immunities would apply to a private tenant in possession. Zurich and one other insurer were the only carriers to quote insurance coverage to Silverstein, but both excluded defense costs. Silverstein's agent accepted Zurich's quote on July 18, 2001, and Zurich issued its Binder. Thus, it appears that but for Zurich's willingness to provide CGL coverage, excluding defense costs, Silverstein was unlikely to procure insurance. Furthermore, one might surmise that an inability to procure adequate liability coverage would have ad-

versely affected his ability to obtain financing and to enter into the leasing transactions with the Port Authority.

Zurich's Binder, excluding coverage for defense costs, provided: "Defense Cost in addition to the Limit of Liability[,] ALAE [Allocated Loss Adjustment Expense]— Outside the SIR [Self Insured Retention] / Deductible and paid / reimbursed 100% by the insured." [7] In other words, that the insured was to pay all defense costs, and defense costs were not to be offset against the SIR (Self Insured Retention) or the deductible. On August 1, 2001, Silverstein asked Zurich to reconsider and provide defense coverage, but Zurich refused.

WTCP, a defendant in numerous lawsuits arising from the September 11th attacks on the World Trade Center, alleges that Zurich is the real party in interest in the Underlying Cases and that WTCP has incurred, and will continue to incur, substantial costs to defend such suits on Zurich's behalf. WTCP seeks a declaration compelling Zurich to defend it in these cases. WTCP argues that New York's insurance laws and regulations make it illegal for an insurance carrier to exclude coverage for defense costs, except as a set off against self insured retentions or deductibles. 11 N.Y.C.R.R. § 71 (2003).

1. *New York Insurance Statutes and Regulations*

New York Insurance Law section 1113 provides the types of insurance that insur-

---

**7.** Zurich's Binder provided a $100,000 self insured retention and a $150,000 deductible in excess of that retention, for a total retention of $250,000 per occurrence. A SIR differs from a deductible in that a SIR is an amount that an insured retains and covers before insurance coverage begins to apply. Once a SIR is satisfied, the insurer is then liable for amounts exceeding the retention. less any agreed deductible. Barry R. Ostrager & Thomas R. Newman. *Handbook on Insurance Coverage Disputes* § 13.13[a] (12th ed. vol.2, 2004). Policyholders frequently em-

ploy SIRs to forego increased premiums where they face high frequency, low severity, losses. *See CSX Transp. Inc. v. Continental Ins. Co.*, 343 Md. 216, 680 A.2d 1082, 1096 (1996). In contrast, a deductible is an amount that an insurer subtracts from a policy amount, reducing the amount of insurance. With a deductible, the insurer has the liability and defense risk from the beginning and then deducts the deductible amount from the insured coverage. Ostrager & Newman. *Handbook on Insurance Coverage Disputes* § 13.13[a].

ers are authorized to write: "The power to do any kind of insurance against loss of or damage to property shall include the power to insure all lawful interests in such property...." N.Y. Ins. Law § 1113(a) (McKinney Supp.2003). Subdivisions (13) and (14) of section 1113 authorize insurers to provide coverage for personal injury and property damage, respectively, "against the legal liability of the insured, and against loss, damage, or expense incident to a claim of such liability...." N.Y. Ins. Law § 1113(a)(13), (14). A note to the Insurance Law Revision explains that "loss, damage or expense" "is intended to include the usual provisions whereby the insurance company agrees to provide for the defense of an action against the insured, and to furnish all services and expenses incident thereto." N.Y. Ins. Law Tentative Draft (1937) at 38. Policies that are inconsistent with provisions of the insurance law remain valid and binding, but are conformed to the legal requirements, that is, the insurer is required to maintain coverage, not only for the insurance it had agreed to extend, but also for that which the law required it to extend. N.Y. Ins. Law § 3103(a)

New York's Insurance Law empowers the Superintendent of Insurance to promulgate regulations that are not inconsistent with statutory provisions. *See* N.Y. Ins. Law § 301 (giving the Superintendent the power to prescribe regulations not inconsistent with provisions of the insurance law). Pursuant to that authorization, the Superintendent has provided that all New York insurance policies include defense costs. Thus, Regulation 107 provides that "no liability insurance policy ... shall be issued ... in this State containing a provision that: (1) reduces the limits of liability

stated in the policy by legal defense costs; (2) permits legal defense costs to be applied against the deductible, if any; or (3) otherwise limits the availability of coverage for legal defense costs." 11 N.Y.C.R.R. § 71.2(a). The Regulation continues, "[n]o liability insurance policy shall be issued or renewed in this State unless legal defense costs are incident to a claim of legal liability covered under the policy." 11 N.Y.C.R.R. § 71.2(c).[8]

The Superintendent promulgated Regulation 107 in October 1983 in response to a trend toward reducing liability coverage by defense costs, or offsetting the deductible or retention amount by defense costs. *See* 11 N.Y.C.R.R. § 71.0. Initially, the Insurance Department intended to preclude such offsets only in personal and automobile policies. Later amendments extended the preclusion to all policies, with two principle exceptions. 11 N.Y.C.R.R. § 71.3. One exception allows certain policies to reduce liability limits or the deductible by no more than 50 percent unless the policy gives the insured control of the defense. 11 N.Y.C.R.R. § 71.3(a-d). A second exception is for "large commercial insureds." 11 N.Y.C.R.R. § 71.1(g) (defining large commercial insureds). Insurers who write coverage for a "large commercial insured," or with a deductible or a self insured retention of a minimum of $100,000 per occurrence, may apply defense costs either to a deductible, or to reduce the amount of liability coverage. 11 N.Y.C.R.R. § 71.3(e). The policy animating this exception states that large insureds are generally "more knowledgeable insurance consumers" and "in a better position to protect themselves or to negotiate protections for themselves from their insurers." 11 N.Y.C.R.R. § 71.0(h). "Giv-

---

8. As the Superintendent's amicus brief explained, section 71.2(c) provides that insurers may not write insurance to cover only defense costs; defense costs must be incident to liability. Suptdt Amicus Br. at 2 n. 1.

en their larger size and greater sophistication, [large] insureds should be more able to respond to claims out of their own resources if their insurance coverage is depleted by defense cost offsets." *Id.*

### 2. Discussion

Zurich argues that Regulation 107, in requiring coverage for defense costs, exceeds the statutory authority given in section 301 to promulgate regulations "not inconsistent" with the permissive authorization to write insurance provided in section 1113. Zurich argues that the CGL Policy should be enforced according to its agreed terms. WTCP argues that Regulation 107 is within the Superintendent's statutory authority and is not inconsistent with statutory law. WTCP argues that Zurich's CGL Policy should be conformed to Regulation 107, and enforced as conformed. *See* N.Y. Ins. Law § 3103(a) (provisions that violate the insurance law are enforceable as if they conformed).

■ Zurich's argument that the Superintendent exceeded his authority in promulgating Rule 107 is not persuasive. *See Molina v. Games Mgt. Servs.*, 58 N.Y.2d 523, 529, 462 N.Y.S.2d 615, 449 N.E.2d 395 (1983) (regulations, unless arbitrary, generally have the force and effect of law). For most cases and in most situations. Rule 107 states a general rule and exceptions that insurers and insureds have been able to follow. However, as the parties before me have represented, Zurich's exclusion of defense costs from the coverage it wrote for the World Trade Center is unique. No precedents sufficiently related to the unique sets of risks incident to insuring the leaseholds of the Twin Towers and related buildings commencing in July, 2001 as to enable reliable underwriting of the insurance with respect to both issues of liability and issues of defense costs. The caution I expressed earlier in this opinion about deciding matters of such importance in the context of a Rule 12 motion, based only on the pleadings, and without discovery, applies to this issue as well.

Zurich represents that it could not underwrite coverage for defense costs without historic data that was not presented, or could not be presented, to it. Furthermore, the issues of the Port Authority's sovereign immunity, as it might or might not extend to particular issues of liability arising from the leaseholds held by private lessees exacerbated the underwriting problems of the insurer. Yet, there was insufficient time to resolve those problems because proper insurance coverage was presumably a precondition for Silverstein's ability to finance the leasing transactions his companies were about to enter with the Port Authority. In any event, Zurich was unwilling to issue an insurance binder except if defense costs were excluded, and Silverstein, despite efforts to persuade Zurich to cover defense costs, appeared to be without an alternative unless he accepted a binder with such exclusion. One may reasonably infer that Silverstein could not have consummated the leasehold transactions with the Port Authority unless he had Zurich's insurance binder.

For these reasons, and others that might appear from a full record, I am unwilling to grant WTCP's motion that I rewrite the policies to include coverage for defense costs. Doing so would confer a windfall on WTCP, granting Silverstein that which he could not obtain in negotiations. The New York Superintendent has ample power to enforce the Insurance Law of New York if Zurich's actions in this case are deemed to violate the law. The intervention of this court, on the scant record now before me, would be inappropriate.

WTCP contends that New York case law supports its argument that Zurich's Binder

and the CGL Policy should be rewritten to include defense coverage. *See Molina v. Games Management Services,* 58 N.Y.2d 523, 462 N.Y.S.2d 615, 449 N.E.2d 395, 398 (1983); *Dingle v. Prudential Prop. and Cas. Ins. Co.,* 85 N.Y.2d 657, 628 N.Y.S.2d 15, 651 N.E.2d 883, 884–85 (1995); *Allcity Ins. Co. v. Williams,* 120 A.D.2d 1, 506 N.Y.S.2d 974, 977 (N.Y.App.Div.1986). WTCP's argument is not persuasive.

*Molina* concerned a refusal to pay an allegedly winning lottery ticket because the purchase was not properly recorded. 449 N.E.2d at 395. The New York Court of Appeals upheld the refusal to pay, holding that the lottery ticket was invalid because it failed to meet minimum regulatory requirements mandated by the legislature to prevent counterfeiting and fraud. *Id.* at 396–97. *Molina* is not applicable, for the lottery presents different factual and legal issues and we are involved, not with the issue of invalidity of a winning ticket, but rewriting a policy with substantial and unforeseeable consequences.

*Allcity* and *Dingle* involved automobile accidents. In both cases, insurers failed to comply with mandatory insurance regulations. In *Allcity* an insurer denied coverage for a New York car that was driven off the road in New Jersey, stating that its collision coverage applied only to damage from contact between cars. *Allcity,* 506 N.Y.S.2d at 975–76. However, New Jersey law required coverage for such accidents, and New York regulations required that policies must comply with the type of coverage required by a state in which a vehicle may travel. *Id.* The court held that coverage must be extended. *Id.* In *Dingle,* an insurer refused to pay interest on the full amount of a jury award, which exceeded the policy limits. *Dingle,* 628 N.Y.S.2d 15, 651 N.E.2d at 884. The court held that, under the pertinent regulation, an insurer was liable for interest on the

portion of the judgment only up to the policy limits. *Id.* at 886. Neither case involved the clarity of Zurich's exclusion, nor the drastic consequences of requiring an insurer to cover a substantial risk that the insurer had refused to cover, a requirement that, if ordered, could well raise issues of Constitutional dimensions. Furthermore, *Allcity* and *Dingle* are uncertain precedents for fields outside of automobile insurance. *See Slayko v. Security Mutual Ins. Co.,* 98 N.Y.2d 289, 746 N.Y.S.2d 444, 774 N.E.2d 208, 211 (2002) ("Cases involving auto insurance coverage–an area in which the contractual relationship and many of its terms are prescribed by law–provide a weak basis for generalization about . . . other insurance contracts.").

WTCP also cites *Bersani v. General Accident Fire & Life Assurance Co.,* 36 N.Y.2d 457, 369 N.Y.S.2d 108, 330 N.E.2d 68 (1975), which too is distinguishable. In *Bersani,* the owner and mortgagor of real estate procured a fire insurance policy, as required for mortgage purposes, but agreed with the insurer that no claims would be made on the insurance. *Id.* at 69–70. The court, refusing to facilitate a fraud on the lending bank, held that the policy was enforceable. It cited the precursor to section 3103 as authorizing it to enforce the policy in accordance with statutory requirements. *Id.* Again, the case is distinguishable from the case at bar, which does not involve fraud or an agreed subversion of contractual terms.

The amicus brief of the New York Insurance Department argues that New York requires all liability policies to include defense cost coverage incident to covered claims, suggesting, in effect, that I either invalidate Zurich's CGL policy, or rewrite it to include defense cost coverage. The position of the Insurance Department, although helpful, is not binding. *Skidmore v. Swift,* 323 U.S. 134, 140, 65 S.Ct. 161, 89

L.Ed. 124 (1944) (courts should respect amicus briefs to the extent it is persuasive); *Schneider v. Feinberg,* 345 F.3d 135, 143 (2d Cir.2003) (agency guidelines "bring the benefit of specialized experience to bear on the meaning of a statute, are ... entitled to some deference") (internal citations omitted). The Department's position appears to reflect the fact that traditionally all insurance included a duty to defend. *See Continental Casualty Co. v. Rapid–American Corp.,* 80 N.Y.2d 640, 593 N.Y.S.2d 966, 609 N.E.2d 506, 509 (1993) ("liability insurance, ... is, in fact, litigation insurance as well.") (internal citation omitted). But this was not a traditional situation; as was asserted at oral argument, it may be the first known instance where an insurer completely excluded defense coverage. Indeed, it appears to be a scenario the Insurance Department did not anticipate when promulgating Regulation 107.

Neither remedy proposed by the Insurance Department appears appropriate. As where an alleged illegality in contracting is considered *malum prohibitum* and not *malum in se,* the court has discretion in its decision whether, and to what extent, to enforce a term of a contract that is inconsistent with state law. *Lloyd Capital Corp. v. Pat Henchar, Inc.,* 80 N.Y.2d 124, 127, 589 N.Y.S.2d 396, 603 N.E.2d 246 (N.Y.1992) ("contracts which violate statutory provisions are merely *malum prohibitum,* the general rule [that unlawful contracts are generally unenforceable] does not always apply [if] relief is wholly out of proportion to the requirements of public policy or appropriate individual punishment.") (internal citation omitted). Thus, Judge Raymond J. Dearie, in *In Re Ambassador Group, Inc. Litig.,* 738 F.Supp.

57, 65 (E.D.N.Y.1990), in considering an endorsement that failed to provide a required notice under Regulation 107, but otherwise complied with New York public policy, upheld the endorsement. Judge Dearie ruled that "under New York law, the effect of a violation of insurance regulations is determined by carefully balancing the equities of the parties." *Id.* (quoting *Farley v. Metropolitan Life Ins. Co.,* 127 A.D.2d 99, 513 N.Y.S.2d 712, 715 (2d Dep't 1987)). I agree that balancing the equities is the most appropriate approach to evaluate policies that fail to conform to regulatory requirements.

The Insurance Department's position is further weakened by the fact that, under two exemptions in the regulations, insurers can issue policies achieving a substantially similar effect. First, unauthorized insurers are specifically exempt from Regulation 107. *See* 11 N.Y.C.R.R. § 27.10(a) ("Policies issued by unauthorized insurers pursuant to this Part are exempt from the provisions of Part 71 (Regulation 107)").[4] Thus, under the regulations, it would have been acceptable for an unauthorized insurer to write the CGL Policy as is. Since the policy favoring authorized insurers is intended to foster a more secure and regulated market monitored by the Insurance Department, it is more desirable that authorized insurers write coverage. To rewrite this policy now on the technicality that Zurich, an authorized insurer, wrote the policy, and not one of Zurich's unauthorized affiliates, would be inconsistent with New York policies as well as basic contract and insurance principles.

Secondly, the exception to the general prohibition of Regulation 107 allows authorized insurers of large commercial insureds to issue wasting policies whereby

---

**4.** An unauthorized insurer may write insurance in New York thorough an excess line broker when an insured, after diligent effort, is unable to obtain coverage "in whole or in part from authorized insurers." 11 N.Y.C.R.R. § 27.0(a).

the defense costs reduce liability limits or offset against a deductible. *See* 11 N.Y.C.R.R. § 71.3(e). Thus, had Zurich issued the CGL Policy in this manner it would be permitted under the exception. 11 N.Y.C.R.R. § 71.3(e). Since at this stage, I am not aware of the consequences of such possible arrangements or which party, in this case, will control the defense, or whether the defense will be joint, it is premature for me to pass judgment on the issue. Furthermore, the Superintendent recognizes that large commercial insureds like WTCP have the ability to protect themselves and "respond to claims out of their own resources if their insurance coverage is depleted by defense costs." 11 N.Y.C.R.R. § 71.0(h). I see no reason at this point to upset the bargain reached by Zurich and WTCP.

*Conclusion*

For the reasons stated, I deny both motions. At this stage of the proceedings, and before discovery, it is unclear if the parties intended the Port Authority to be an Additional Insured under Zurich's Binder, nor what scope any such coverage might have. I hold also that Regulation 107 does not require rewriting the CGL Binder and Policies to include defense costs.

SO ORDERED.

APPENDIX A

# WTC Entities
## Structure Chart