WTC CAPTIVE INSURANCE
COMPANY, INC.,
Plaintiff,

v.

LIBERTY MUTUAL FIRE INSUR-ANCE COMPANY; Certain Under-writers at Lloyd's, and Certain Lon-don Market Insurance Companies; Assicurazioni Generali S.P.A.; and General Security Indemnity Company of Arizona, As Attorney in Fact for and Successor in Interest to General Security Indemnity Company (Now known as Hudson Specialty Insurance Company), Defendants.

No. 07 CIV 1209 AKH.

United States District Court,
S.D. New York.

March 19, 2008.

Gregory Albert Krauss, Margaret Hanley Warner, Mark Allan Collins, McDermott, Will & Emery, Washington, DC,

Robert A. Weiner, McDermott, Will & Emery, New York, NY, for Plaintiff.

Albert Yong Chang, Larry P. Schiffer, Lawrence W. Pollack, Dewey & Leboeuf, L.L.P., New York, NY, Fred William Reinke, Dewey & Leboeuf, L.L.P., Washington, DC, for Defendants.

Denise Ava Rubin, Napoli Bern Ripka, LLP, Christopher R. Lopalo, Worby, Groner, Edelman & Napoli Bern, L.L.P., New York, NY, for Intervenor.

### ORDER DENYING DEFENDANTS' MOTION TO RECONSIDER SUBJECT MATTER JURISDICTION

ALVIN K. HELLERSTEIN, District Judge.

This case involves a clash among insurance carriers.

In the aftermath of the terrorist-related aircraft crashes into the World Trade Center on September 11, 2001, the City of New York procured insurance to protect itself and its contractors from loss, liability and expense arising from the removal of debris from the collapsed Twin Towers. Approximately 10,000 lawsuits have been filed against the City and its contractors relating to such work, all consolidated before me pursuant to this court's exclusive jurisdiction. *See* Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101, ("ATSSSA"), Section 408(b)(3). Under the Act, the City cannot be liable, in the aggregate, for more than its insurance coverage (more precisely, the greater of $350 million or its insurance coverage). *Id.*, section 408(a)(3). The lawsuit brought by the insurance carriers will fix that coverage, and requires me to rule who among them, and in what sequence, should bear the costs of defending the 10,000 lawsuits, and pay for the liabilities or losses that

might be incurred. At the threshold, I am required to rule if this court has subject matter jurisdiction over the insurance companies' lawsuit.

I ruled in favor of this court's jurisdiction twice before, once in related litigation brought by and against the insurance carriers protecting the owners and lessees of the Twin Towers from loss, liability and expense, *see In re Sept. 11th Liab. Ins. Coverage Cases*, 333 F.Supp.2d 111, 115–19 (S.D.N.Y.2004), and again in the present case, by Order dated December 14, 2007. I write now, in response to the insurance carriers' motion for reconsideration, to provide a fuller explanation of this court's subject matter jurisdiction.

### The City's Insurance Program

In the wake of the September 11 attacks on the World Trade Center, and in connection with the massive job that lay ahead to clear the debris of the attacks, the City sought and obtained insurance protection. Protection in the amount of $77 million was obtained, arranged in several layers.

Liberty Mutual Fire Insurance Company ("Liberty Mutual"), a Massachusetts company with its principal place of business in Boston, retroactively engaged to be the primary carrier.[1] While the complaint alleges that the policy was obtained shortly after September 11, 2001, the precise date is unknown. The policy provided $4 million aggregate coverage to the City and its contractors and consultants for bodily injury occurring in connection with the World Trade Center clean-up effort, and covered the period from September 11, 2001 to December 31, 2002. The policy imposed a duty on Liberty Mutual to defend the insureds up to the indemnity limits of the policy. The policy was subject to a num-

---

1. WTC Captive and Liberty Fire have reached a private agreement after the onset of this litigation. See *Order Dismissing Defendant* *Liberty Mutual Fire Insurance Company,* dated January 4, 2008.

ber of exclusions, including an exclusion for "bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' ".

The City contracted also for excess coverage in the London market, arranging the next $75 million layer of coverage with various syndicates at Lloyd's, joined by Assicurazioni Generali S.p.A., and General Security Indemnity Company of Arizona (collectively the "London," or the "Excess" "Insurers"). Two policies were obtained, the first, contracted for on October 5, 2001, for $50 million of coverage, and the second, contracted for on January 9, 2002, for $25 million of coverage. Like the primary coverage provided by Liberty, the excess coverage provided by the London Insurers covered the City and its contractors for their exposure to liability and loss arising from the clean-up efforts at the World Trade Center covering the period from September 11, 2001 to December 31, 2002. The policies also covered the City against the expense of defending the claims and lawsuits brought against it, with the costs of such defense to be additional to, and not subtracted from, the City's liability and loss. The London Insurers' policy also contained various exclusions, including a pollution exclusion barring coverage for bodily injury "arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world". The London Insurers' liability arises upon the exhaustion of the Liberty Mutual policy, and in excess of the insured's retained limit, which the London Insurers allege to be between $250,000 and $2 million per occurrence. The London Insurers' duty to defend ends when the policy limits have been exhausted.

Approximately two years later, on December 3, 2004, the City obtained additional protection for itself and its contractors from the Federal Emergency Management Agency ("FEMA"). Funded by a grant from FEMA, a not-for-profit, captive insurance company was formed— WTC Captive Insurance Company ("WTC Captive")—to protect the City and its contractors against loss, liability and expense that exceeded the City's existing insurance protection. The WTC Captive received roughly $1 billion in funds from FEMA and insured the City and its contractors and consultants against claims arising in connection with the World Trade Center clean-up effort. In contrast with the other policies, the WTC Captive policy does not appear to contain a pollution exclusion. Like the other policies, the WTC Captive policy obligated the WTC Captive to undertake the defense of the insured, but the WTC Captive's duty to defend was not triggered until the underlying insurers' duties to defend had been exhausted, and was to last until its own policy limits were exhausted. The Liberty Mutual policy and both London Insurers' policies are listed as underlying policies in the WTC Captive policy.

### The Prior Proceedings

Beginning in 2002, and continuing to the present, the City and its contractors were sued by those who worked at the World Trade Center site, to recover damages for the personal injuries they allegedly incurred—mostly, injuries to their respiratory tracts and various cancers. The City and the Contractors made demand upon its insurance carriers to defend it in such suits, but only WTC Captive responded affirmatively, beginning in the Fall of 2004. There are now approximately 10,000 of these suits. They are all pending in this court and are assigned to me. They are consolidated for coordinated pre-trial discovery. See *The World Trade Center Disaster Site Litigation*, 21 MC 100.

Beginning in October 2002, the City and its contractors provided notice to the London Insurers of the claims pending against them in connection with the World Trade Center clean-up effort. In February 2006, the WTC Captive began providing notice to the London Insurers of their duty to defend the City and its contractors, and seeking reimbursement for the expenses WTC Captive had thus far incurred.[2]

The London Insurers claim that the first notice they received of the claims against the City and its contractors was in August 2006, from the WTC Captive. In October 2006, the London Insurers informed the WTC Captive by letter that they would not assume the defense of the insured because they were not given timely notice and because, upon the London Insurers' preliminary review of the demand, they believed that the claims would not be covered by the insurance policies. The London Insurers followed their October 2006 letter with a second letter in January 2007, disclaiming coverage and any duty to defend the insureds.

On February 16, 2007, WTC Captive filed this lawsuit against the London Insurers, seeking a declaration that the London Insurers had a duty to defend the City and its contractors in the 21 MC 100 litigation, and damages. The London Insurers moved to dismiss, contending that this court lacked subject matter jurisdiction. On December 14, 2007, I denied the motion, and held that the district court had supplemental jurisdiction pursuant to 28 U.S.C. § 1367. I ruled that because, under the ATSSSA, the City could not be liable beyond its insurance limits, I would not be able to determine, or help the parties resolve, the lawsuits against the City without first determining the scope and extent of the City's insurance coverage. Since, under *McNally v. Port Authority*

*(In re World Trade Center Disaster Site)*, 414 F.3d 352 (2d Cir.2005), all these workers' suits arose from, or were related to, the terrorist-related aircraft crashes into the World Trade Center, regardless if the injuries complained of arose immediately after September 11, or at any time thereafter until the clean-up work was completed approximately eight months later, in May 2002, the City's insurance coverage also had to be determined by the same court that had exclusive jurisdiction of the underlying lawsuits.

On January 3, 2008, the London Insurers moved for reconsideration, arguing that I had overlooked *Peacock v. Thomas*, 516 U.S. 349, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996), a case that they previously failed to cite, and generally re-arguing their motion. I denied the motion, and denied also defendants' motion to certify the decision for interlocutory appeal. I write to present my reasoning more fully.

### *Discussion*

1. *The Bases for Reconsideration Have Not Been Satisfied*

■ A motion for reconsideration may be granted to (1) correct clear error; (2) prevent manifest injustice; or (3) consider newly-available evidence. *USA Certified Merch. LLC v. Koebel*, 273 F.Supp.2d 501, 503 (S.D.N.Y.2003). The criteria are "strict;" reconsideration generally is denied unless the moving party can point to "controlling decisions or data that the court overlooked," and such matters must be of such importance as reasonably to expect that they "alter the conclusion reached by the court". *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). A court's reconsideration of a previous order "is an extraordinary remedy to be employed sparingly in the interests of

---

**2.** The precise details of the notice afforded to the London Insurers will be set forth in great-

er detail in the forthcoming opinion on the parties' cross-motions for summary judgment.

finality and conservation of scarce judicial resources". *In re Health Mgmt. Systems Inc. Sec. Litig.*, 113 F.Supp.2d 613, 614 (S.D.N.Y.2000) (internal quotation marks and citation omitted). Displeasure with a result is not a basis for the motion; the motion is not intended to provide an opportunity to reargue issues that have already been decided. *In re Houbigant, Inc.*, 914 F.Supp. 997, 1001 (S.D.N.Y.1996).

■ The insurance carriers have no basis to ask for reconsideration. Their arguments are a rehash of the arguments they previously made, with one exception, their reference to *Peacock v. Thomas*, 516 U.S. 349, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996). The case, however, is not controlling, and is readily distinguishable. Indeed, the London Insurers failed previously to cite it, an indication that they, as well, gave it little regard. They now claim that *Peacock* is important, but a motion for reconsideration is not the time to bring a supposedly important precedent to the court's attention. Motions for reconsideration are not intended to save the parties from the consequences of their own research neglects. *See Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*, 948 F.2d 111, 115 (2d Cir.1991) (party may not raise arguments for the first time on a motion for reconsideration).

For all these reasons, I normally would deny such a motion for reconsideration without discussing the merits. However, because the issue is jurisdiction, always a basic proposition in federal jurisprudence, and because of the intense public interest in all aspects of the 9/11 litigation, a written review of the jurisdictional merits is a useful discipline.

For the reasons that follow, I hold that this court has supplemental jurisdiction, pursuant to the ATSSSA, over the issues of this case, declaring the rights and liabilities of the City and its contractors vis-à-vis the City's insurance carriers, and be-

tween those carriers and the WTC Captive established pursuant to the one billion dollar grant of FEMA.

### 2. The Air Transportation Safety and System Stabilization Act

On September 22, 2001, less than two weeks after the 9/11 attacks, Congress passed the Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101. Section 408(b)(3) of the Act gave the United States District Court for the Southern District of New York "original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001". Congress enacted section 408(b)(3) so that uniformity and expertise could be concentrated in a single court dealing with all 9/11–related litigation, and to avoid the possibility of inconsistent judgments. *McNally*, 414 F.3d at 377; *In re Sept. 11th Liab. Ins. Coverage Cases*, 333 F.Supp.2d at 117. The Second Circuit, in *McNally*, ruled that because of this section, and the Congressional intent that it reflects, all workers' claims, throughout the period of work on the World Trade Center site, from September 11, 2001 to May 2002, could be heard only in the Southern District of New York, and in no other court.

In passing the ATSSSA, Congress sought to protect America's aviation industry against its exposure to what was thought might be ruinous liability and years of litigation in State and federal courts throughout the United States. Thus, pursuant to the Act, the airlines' liability, and the liability of related aviation defendants, was limited to their insurance coverages, and all cases against such aviation defendants relating to 9/11 had to be heard in the United States District Court for the Southern District of New York.

Soon after the original passage of the ATSSSA, section 408(a)(3) was added, providing the City and the Port Authority with similar protection to that of the airlines, via a ceiling beyond which the City could not be liable. Section 408(a)(3) provides,

> Liability for all claims, whether for compensatory or punitive damages or for contribution or indemnity arising from the terrorist-related aircraft crashes of September 11, 2001, against the City of New York shall not exceed the greater of the city's insurance coverage or $350,000,000.

In *McNally*, the court of appeals ruled that this ceiling applied to all the lawsuits filed and to be filed against the City for personal injuries incurred by workers in the clean-up efforts of the World Trade Center debris, beginning immediately upon the terrorist-relate aircraft crashes into the Twin Towers of the World Trade Center, and extending until the clean-up efforts were concluded eight months later, in May 2002. 414 F.3d at 358.

### 3. *The Issues of Federal Jurisdiction*

 A dispute among insurers arises from their several contracts of insurance, and the resolution of such disputes requires that the language of the contracts be applied or interpreted. However, in this case, the WTC Captive argues that the cases relate to, and arise from, the events of 9/11, and are therefore embraced by the ATSSSA. The Captive's argument depends on the unique jurisdiction-conferring section of the governing statute, providing that cases "arising from" or "related to" the events of 9/11 are federal claims, and that all such claims are subject to the exclusive jurisdiction of the United States District Court for the Southern District of New York. *See* ATSSSA, section 408(b)(3).

I do not accept this argument. The disputes bounded by an insurance contract arise under State law, not federal law, and

in normal situations, the policy considerations governing the interpretation and regulation of such contracts are State, not federal, considerations. Thus, on several occasions, the Court of Appeals rejected jurisdiction over claims against insurers because of losses arising from the events of 9/11. *See, e.g., Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG*, 335 F.3d 52 (2d Cir. 2003) (reinsurer's claim against a retrocessionaire alleging breach of indemnification contracts which spread the risk of loss under upstream primary insurance policies fell outside the ATSSSA's jurisdictional provisions because the actual events of 9/11 were irrelevant to the dispute, and simple "but for" causation was not enough to bring the dispute within the ATSSSA's reach); *Combined Ins. Co. of Am. v. Certain Underwriters at Lloyd's London*, 75 Fed.Appx. 799 (2d Cir.2003) (breach of contract claim by insurer providing coverage for losses due to the events of 9/11 under the employer's accidental death and dismemberment policy did not fall within ATSSSA jurisdiction because resolution of the claim did not require the court to reference or examine the events of 9/11). However, these cases did not involve the World Trade Center, or limitations on rights and recoveries provided by the ATSSSA. Thus, the cases cited above are distinguishable.

### 4. *The Issues of Federal Supplemental Jurisdiction*

 Supplemental jurisdiction is defined by 28 U.S.C. § 1367. Pursuant to § 1367(a), a district court may exercise supplemental jurisdiction over any claim that is so related to claims over which the district court has original jurisdiction "that they form part of the same case or controversy under Article III of the United States Constitution". Thus, the issue is the degree of relatedness between the in-

stant dispute and the lawsuits of the workers against the City and its contractors.

The standard set forth in 28 U.S.C. § 1367 has been "construed generously", *Smylis v. City of New York*, 983 F.Supp. 478, 484 (S.D.N.Y.1997), and federal courts have found that a "loose factual connection is generally sufficient". *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir.1995). The Supreme Court has directed district courts to consider the values of judicial economy, convenience, fairness and comity in deciding whether to exercise supplemental jurisdiction. *See City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997).

■ Federal courts typically hold that they have supplemental jurisdiction over third-party actions brought by insureds against their insurers to declare rights and obligations of insurance contracts. *See, e.g., Garfield Slope Housing Corp. v. Pub. Serv. Mut. Ins. Co.*, 973 F.Supp. 326, 330 (E.D.N.Y.1997); *Bruce v. City of Middletown*, 781 F.Supp. 1013, 1016 (S.D.N.Y. 1997). If the underlying case by or against the insured satisfies federal jurisdiction, there does not have to be an independent basis of jurisdiction over the third-party action between the insured and the insurer, because supplemental jurisdiction lies. *Id.* At oral argument, the London Insurers conceded that a case against it brought by the City or its contractors in the underlying litigation would be embraced by this court's supplemental jurisdiction pursuant to section 1367. But, the London Insurers argue, since WTC Captive is not a party to the underlying suits, there should be no independent basis of jurisdiction against the London Insurers.[3]

The arguments of the London Insurers are simplistic, and without merit. WTC Captive, although not technically a party, is bound up in all the 10,000 lawsuits against the City comprising the underlying federal actions. The insurance it provides to the City will define the ceiling of liability to which the City is exposed, and against which the plaintiffs may make claim and seek recoveries. The costs of defense it has advanced, and may continue to advance, to defend the City and its contractors diminish the insurance available to pay claims, and the claims of WTC Captive against the London Insurers to define who has the obligation to pay defense costs, and in what sequence, will directly and vitally affect the aggregate recoveries obtainable by the plaintiffs. Indeed, there is serious question if any money can be paid out in settlements, if and when the parties agree to settlements, without a definition of the aggregate amounts that may be available to fund all settlements.

There are further reasons why the arguments of the London Insurers are without merit. Had the City and its contractors filed third-party actions against all its insurers, including WTC Captive, the insurers, in defense, could have filed fourth-party actions against one another to sort out the sequence of insurers' obligations to provide a defense. Clearly, this court has jurisdiction over such a suit of impleader, see Rule 14, Fed.R.Civ.P., *see Am. Zurich Ins. Co. v. Cooper Tire & Rubber Co.*, 512 F.3d 800, 806 (6th Cir.2008); *Reinhart Oil & Gas, Inc. v. Excel Directional Techs., Inc.*, 463 F.Supp.2d 1240, 1262 (D.Colo. 2006), and the London Insurers so conceded in arguing their motion, *see* 2/5/08

---

**3.** The Lloyd's insurance syndicates do not have a jural personality. Thus diversity requires a finding that none of the insuring syndicates' members are citizens of New York, the state of incorporation and principal place of business of WTC Captive. Since I am not able to make that finding, the dispute cannot be heard in this Court as a diversity case.

Tr., at 6–7. Federal jurisdiction is no less if, instead of a third-party lawsuit serving as predicate, WTC Captive advanced the funds and then brought its declaratory judgment action against the insurers having the primary duty to provide a defense in a separate action, particularly in light of the exigencies and dangers to health and safety incident to the smoking and festering piles of debris following 9/11. Technically, WTC Captive, by advancing funds owed primarily by other insurers, became subrogated to the rights of the City and its contractors against those other insurers, thus gaining the right to file third-party actions against Liberty Mutual and Lloyds. *See Fed. Ins. Co. v. Arthur Andersen & Co.,* 75 N.Y.2d 366, 372, 553 N.Y.S.2d 291, 552 N.E.2d 870 (1990), 16 Couch on Ins. § 222:5 (3d ed.2007).

 Neither the City nor WTC Captive should be required to file separate third-party actions in each of the 10,000 lawsuits against the City. That would be a useless as well as extremely burdensome and expensive rule to follow, for the parties and for the Court. WTC Captive's declaratory judgment lawsuit against Lloyds serves precisely the same function in one action as 10,000 such third- and fourth-party actions. The concept of supplemental jurisdiction is practical, and technical niceties should not defeat practical needs. We can never forget the City's urgent need to restore normal existence, eliminate the hazard of the debris pile to the health and safety of the New York City populace, mind the safety of its firefighters, police and construction workers, and preserve the fiscal soundness and financial integrity of the City. As the Court of Appeals ruled in *McNally,* federal jurisdiction conferred by Congress should be liberally and unstintingly ap-

plied, both directly and through supplemental jurisdiction.

I held, in *September 11th Liability Insurance Coverage Cases,* 333 F.Supp.2d 111 (S.D.N.Y.2004), a case concerning the allocation and sequence of insurance coverage among the insurance carriers covering the owner and lessees of the Twin Towers of the World Trade Center, that the unique statutory framework of the ATSS-SA made "the scope and extent of the defendants' liability coverage, whom the policies cover, ... crucial to the dispositions of the Underlying Cases".[4] 333 F.Supp.2d at 117. I also noted the risk of inconsistent or inefficient judgments if the insurance dispute was litigated in various State courts while the underlying litigation remained before me, and observed that such a result would defeat "Congress' desire for uniformity and expertise in dealing with these cases". *Id.* at 117.

The instant dispute presents me with nearly identical legal issues. Whether the issues are raised by third and fourth party pleadings in each of the 10,000 cases, or by a single declaratory judgment relating to those cases, is not important. Supplemental jurisdiction is fundamentally needed to promote judicial economy and efficiency, and to avoid delays and inconsistencies of proceedings in the state courts. There is no principled reason to distinguish this case from the prior insurance dispute.

### 5. *Peacock v. Thomas Is Distinguishable and Not Relevant*

In *Peacock v. Thomas,* 516 U.S. 349, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996), the case on which the London Insurer's motion for reconsideration is based, federal jurisdiction for the underlying action was prem-

---

4. As discussed *supra,* the ATSSSA contains a similar liability cap as the cap applicable to the City for "persons with a property interest in the World Trade Center". ATSSSA, § 408(a)(1).

ised on the special and limited provisions of ERISA, 29 U.S.C. § 1132(a). The plaintiff, in that lawsuit, sued his former employer, Tru–Tech, Inc., and its principal officer and shareholder, D. Grant Peacock. The district court had jurisdiction over, and entered judgment against, Tru–Tech, but had no jurisdiction over Peacock, since he was not a fiduciary. *See* 516 U.S. at 351, 116 S.Ct. 862. However, when Thomas was not able to enforce his judgment against Tru–Tech, Thomas again sued Peacock, claiming that Peacock preferred to pay other creditors of Tru–Tech. The Supreme Court, reversing the Court of Appeals and the District Court, held that Thomas' State claim for fraudulent conveyances and preferences against Peacock could not be used to enlarge ERISA jurisdiction, neither directly nor by any theory of supplemental jurisdiction.

The Supreme Court, quoting *Kokkonen v. Guardian Life Insurance Co.*, 511 U.S. 375, 379–80, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994), ruled that ancillary jurisdiction was appropriate "(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees," *id.* at 354, 116 S.Ct. 862, and that neither consideration applied to Thomas' case. The first—the ERISA lawsuit—had already been resolved, and neither the convenience of the parties nor considerations of judicial economy supported the exercise of ancillary jurisdiction in the second lawsuit. Furthermore, the first ERISA lawsuit, and the second fraudulent conveyance lawsuit, were neither factually nor legally interdependent, and there was no sufficient interest of judicial efficiency or economy that could justify the exercise of ancillary jurisdiction. The Supreme Court noted also that Thomas's second lawsuit attempted to impose an obligation for an existing federal judgment on an individual who was not originally liable for the judgment. *Id.* at 356–57.

*Peacock* has no bearing on whether I should exercise supplemental jurisdiction over WTC Captive's lawsuit against the London Insurers. Unlike *Peacock*, the 10,000 lawsuits over which I preside are currently pending, and they are heavily dependent on my being able to regulate the dispute among the relevant insurers. The insurance issues and the liability issues are closely intertwined, and judicial efficiency and practical resolutions clearly will be served by my exercising supplemental jurisdiction. And, unlike *Peacock*, federal jurisdiction over the events of 9/11 are expansive, *McNally*, 414 F.3d at 380, not limited under a finely "articulated" jurisdictional statute. *See* 29 § 1132(a); 516 U.S. at 353, 116 S.Ct. 862. Moreover, *Peacock* is concerned with whether federal jurisdiction may be extended to enforce judgments, an issue that is not before me. *Cf. Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 104 (2d Cir.2001) (examining whether a fraudulent transfer cause of action falls within a federal court's enforcement power, and analyzing *Peacock* as a case concerning the "enforcement branch" of ancillary jurisdiction); *UFCW Local 174 Commercial Health Care Fund v. Homestead Meadows Foods Corp.*, 425 F.Supp.2d 392, 394 (S.D.N.Y.2005) (examining *Peacock's* impact on ancillary jurisdiction over actions to enforce judgments).

There is good reason why the London Insurers did not bother to cite *Peacock v. Thomas* in their original submissions the case is not relevant. The rule of law announced in *Peacock v. Thomas* does not provide a basis upon which to ask for reconsideration, and it does not provide a reason to suggest a different jurisdictional outcome.

6. *The Decision Is Not Appropriate for Certification*

 I deny also the London Insurers alternative motion, that I certify my decision for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Section 1292(b) provides

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing such an order.

There already have been two interlocutory appeals in the cases against the City, slowing progress by several years. According to newspaper reports, various of the plaintiffs have died or experienced grave consequences to their health while these cases are pending, and claim substantial prejudice from delays. More than six years have passed since September 11, 2001, and much judicial effort has been expended in moving these cases toward resolution or trial. Another delay would cause severe prejudice to many of the litigants.

There has been no showing of any substantial division among courts or commentators regarding the issue of the court's ancillary jurisdiction. An immediate appeal is likely to delay, and not to materially advance, the ultimate termination of the litigation. And if the court is wrong in this and later decisions, the parties on all sides have sufficient financial substance readily to provide redress.

### Conclusion

For the reasons stated in this decision, I deny the London Insurers' motions for reconsideration and to certify my decision for interlocutory appeal. I hold that I have supplemental jurisdiction over this case.

SO ORDERED.